[No. 8100.]

TOWN OF SUGAR CITY ET AL. V. BOARD OF COMMISSIONERS
OF THE COUNTY OF CROWLEY.

1. ELECTIONS—*Contest—Statement of Contest—Amendment.* The provision of Rev. Stat. § 2312 that where the reception of illegal votes is the ground of contest a list of the persons alleged to have voted illegally must be set forth in the statement of contest, is mandatory, and must be strictly construed. A defect in this respect cannot be amended. (435)

The provisions of the Code of Civil Procedure have no application. (437)

2. SPECIAL PROCEEDINGS—*Amendment.* Where in a special proceeding the statute makes no provision for amendments, those of a substantial character are not to be allowed. (438)

3. COUNTY SEATS—*Location or Removal—Election.* The Act of February 11th, A. D. 1881, (Laws 1881, 103, Rev. Stat. § 1171-1176) was intended to establish a uniform procedure regulating all elections concerning county seats. It applies to the conduct of an election for the permanent location of a county seat. (442, 443)

All former legislation upon the subject, inconsistent with its provisions is impliedly repealed. (443)

4. ——*Qualification of Voters.* In view of § 2, art. XIV, and § 1 of art. VII of the constitution, whether the same rule as to residence should be adopted in elections for the location of a county seat, as in one for the removal of a county seat is a question for the legislature. The provisions of the act of 1881, as to this matter are within the legislative power. (446, 447)

5. STATUTES—*Repeal by Implication.* A statute repeals by implication all prior legislation inconsistent with its provisions, even though the latter enactment contains no repealing clause. (443)

6. ——*Construction—The Title of an Act*, is not to be referred to where the provisions of the Act are expressed in clear and unambiguous terms. (445)

7. ——*Title—Sufficiency.* Where it is clear that no member of the legislature could have been misled by the words used as the title to an enactment, nor any citizen of ordinary prudence led astray, the act will be sustained. (448)

The title of the act of February 11, 1881, "An act to regulate elections for the removal of county seats", *held* broad enough to in-

clude an election for the permanent location of the county seat, which had been provisionally appointed by the act organizing the county.

*Error to Crowley District Court.*—Hon. J. E. RIZER, Judge.

Messrs. THOMAS & THOMAS, for plaintiffs in error.

Mr. H. A. HICKS, Mr. I. H. STANLEY, Mr. PERRY BEHYMER, and Mr. CHARLES ROACH, for defendant in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

The General Assembley created the County of Crowley in 1911 and temporarily established its county seat at the town of Ordway, and provided that the county seat should remain there until a permanent county seat was selected and established as provided by law.

The Board of County Commissioners called and caused to be held, at a general election for state and county officers on November 5th, 1912, a special election for the purpose of permanently locating the county seat. Acting under the law of 1881, separate registers and judges of this election were appointed, and separate ballot boxes therefor provided. The judges were required, and actually did, permit to be registered, and to vote upon that question, only such persons as were by the terms of the Act of 1881 entitled to vote, namely, such electors as had resided within the State of Colorado one year, in the county six months, and in the precinct ninety days.

As a result of the election, the board of canvassers, on the 8th day of November, 1912, returned that the town of Ordway had received a majority of twenty-seven of all votes cast upon that question. On the 18th day of November next thereafter, the tenth day after the official canvass, plaintiffs in error filed in the District Court their statement of contest, thereby undertaking to

overturn such election. On the 27th day of that month the defendant in error filed its answer, consisting of five separate defenses and pleas, and one counterclaim. On the 16th of December following, the answer of defendants in error having raised the sufficiency of such statement of contest, because of its failure to set forth a list of names of alleged illegal voters, plaintiffs in error asked leave to amend, and tendered, and requested to have made a part of their original contest statement, a list of such alleged illegal voters, which leave the court denied. It is to be noted that the filing of the application to amend was three weeks after the filing of the answer of defendant in error, and lacked but two days of being a full month after the filing of the original statement of contest.

There are two main questions in this case, incidentally involving some minor ones: First. Should plaintiffs in error have been allowed to file an amendment to the third paragraph of the complaint, by inserting therein or adding thereto the names of those persons who it is claimed were illegal voters? Second. Was the election to locate the county seat held under the provisions of the proper statute, or was the election void, because of the residential qualifications required to entitle persons to vote upon that question?

The Act providing for election contests of this character is not only special, but furnishes a complete system of procedure within itself, summary in its nature. Sections 2308-2319, R. S. 1908. Under the plain terms of section 2308 and those immediately following, it is manifest that the contestors were without right to amend their statement of contest by supplying the very thing which was essential in the first instance to state a ground of contest and give the court jurisdiction. The allegation in the statement of contest to which the amendment was offered reads:

"Third.—That sufficient illegal votes were received, and counted, for the Town of Ordway, as the

location of the permanent county seat of the county of Crowley, at said election, in each of the several voting precincts of the said County of Crowley, to change the result of said election.''

Section 2312, R. S. 1908, reads in part as follows:

''When the reception of illegal or the rejection of legal votes is alleged as the cause of the contest, a list of the number of persons who so voted, or offered to vote, shall be set forth in the statement of contestor.''

This provision is mandatory and must be strictly construed. The language of the statute in this particular, as well as in all other fundamental features, is not subject to amendment under the liberal provisions of the code of civil procedure. In *Schwartz v. County Court,* 14 Colo. page 44, 23 Pac. 84, it was held that in order to give the court jurisdiction the contest statement must contain the list required by section 2312, and the opinion therein contains the following:

''The proceedings upon an election contest before the county judge, under the statute, are special and summary in their nature; and it is a general rule that a strict observance of the statute, so far as regards the steps necessary to give jurisdiction, must be required in such cases. The act under which these contests were instituted not having been complied with in the particular mentioned, the statements filed as the basis of the proceedings are radically defective. Sedg. St. & Const. Law, 299; *Dorsey v. Barry,* 24 Cal. 449; *Casgrave v. Howland,* id. 457; *Norwood v. Kenfield, supra* [30 Colo. 393]; *Loomis v. Jackson,* 6 W. Va. 613; *Buckley v. Lowry,* 2 Mich. 418.

''The act is not only special in character, but it furnishes a complete system of procedure within itself. It requires that such contests shall be tried and determined by the county judge of the county in which the contest arises. It provides for a written statement as the basis of the proceedings, and designates what it shall contain, and the officer with whom it shall be filed. It designates the officer by whom the summons shall be issued, and provides the time and

manner of making up the issues. Provision is also made for fixing the time of trial, and for the form of judgment to be entered, etc. As we have seen, the jurisdiction of the court, under such a statute, depends entirely upon the terms of the act, and consequently, before contestors can invoke such jurisdiction, facts must be stated by them which bring the cases within the purview of the act. In these statements, while the board of registration is charged with fraudulently permitting the names of those not entitled to vote to be registered, the *gravamen* of complaint in each case is that sufficient illegal votes were received and counted for the contestee to change the result of the election; and, unless this can be maintained as a cause of contest, contestors must fail; and yet no attempt has been made to comply with that portion of the act requiring a list of the number of persons who so voted, with the precinct or ward where such votes were cast, to be set forth in the statement. It is reasonable to conclude that the legislature in enacting this requirement had in view the fact that by previous legislation the utmost care had been exercised to provide for the casting of the ballots and the integrity of the count; and it is certainly not unreasonable to require those who desire to contest the right of a person to an office to which he has been declared duly elected by the tribunal provided by law to determine that question, to state with reasonable certainty and precision the cause upon which they rely to overthrow such result. We cannot say that the provision of the statute of 1885, under consideration, is unreasonable, and, if it were, relief must be looked for from the legislature, and not from the courts.

"The court below should have sustained the pleas to its jurisdiction based upon the failure to include in the statements the lists required by the statute. *Fairibault v. Hulett,* 10 Minn. 38 (Gil. 15); High Extr. Rem., § 781; *Keller v. Chapman,* 34 Cal. 635; *Garretson v. County of Santa Barbara,* 61 Cal. 54; *Quimbo Oppo v. People,* 20 N. Y. 531."

Under this rule, upon principle and reason, obviously a contestor should not be permitted to make such an

amendment, long after the time in which a contest might be instituted, the effect of which would be to extend the time allowed by statute within which such an action can be begun, a thing which the legislature could never have contemplated, since the proceedings are special and summary. In the case of *Kindell v. LaBert,* 23 Colo. 385, 48 Pac., 641, 58 Am. St. 234, it is definitely ruled that amendments such as the one here proposed are not permissible under our statute. Speaking to this point in that case this court said:

"In McCrary on Elections, § 396, it is said that an amendment in proper cases should be allowed. Where it is proper, it should be seasonably applied for and under sufficient showing. Ibid. secs. 407, 408. And if it work a continuance or considerable delay, it should not be granted.

"Upon the other hand, where, as in Colorado, the procedure is governed by a special act which does not provide for amendments, and in which the proceedings are not assimilated to some practice that does so provide, it has been expressly held that it was beyond the power of the court to permit amendments to be made. *Ford v. Wright,* 13 Minn. 518, (Gil. 480); *Bull v. Southwick,* 2 N. M. 321, 362, *et seq.;* *Vigil v. Pradt,* 4 N. M. 375, Johns, 20 Pac. 795; 6 Am. & Eng. Ency. of Law, 407.

"In the case of *Schwartz v. County Court,* 14 Colo. 44, 23 Pac. 84, because not necessary to the determination of that case, this court expressly declined to decide the point. But as it held that the act furnished a complete system of procedure within itself, this case gives countenance to the doctrine that, in special proceedings, the right to amend depends upon the provisions of the act itself. Additional recognition is found in the decisions of this court under the eminent domain act, which prescribes a complete system of procedure for the taking or damaging of private property. Under that act it has been decided that the code provisions 'on the subject of amendments to pleadings are inapplicable.' *Knoth v. Barclay,* 8 Colo. 300, 6 Pac. 924; *Tripp v.*

*Overocker,* 7 Colo. 72, 1 Pac. 695; *Colo. Cent. R. Co. v. Allen,* 13 Colo. 229, 242 [22 Pac. 605].

"Upon principle, and in the light of these authorities, we are of opinion that where the statute itself provides for amendments, but does not define their scope, those relating to formal matters, or which are made for the purpose of perfecting and completing causes of contest comprehended within the original statement, may, upon a proper showing and if applied for within a reasonable time, be permitted; but in the absence of such a permissive statute, not even amendments of this nature can be made, and, unless there is a provision expressly so providing, no new cause of action or contest can be set up by way of amendment."

There is nothing whatever in our contest statute providing for amendments of any sort. Since there is no such provision, clearly, under the rule as announced in the *LeBert* case, *supra,* no amendments, certainly none of substance, should be allowed. This court clearly recognizes the rule that the right to amend in special proceedings is purely statutory, and where the statute does not specifically so provide amendments of a substantial nature cannot be made. Moreover, in view of the fact that the amendment was not proposed until some three weeks after answer filed, and practically one month after the contest was begun, even were the holding otherwise as to the right to amend, still in the instant case it certainly cannot be said that there was an abuse of discretion in refusing to allow it.

Was the election held under the proper statute? The determination of this question depends upon a consideration of various constitutional provisions and statutes relating thereto. At the time of the adoption of the constitution the following territorial statutes upon the subject under consideration were in force:

"It is further provided that the people may locate permanently the county seat in any part of the county, by a vote of the majority of the legal voters

in each county according to law. § 1165, R. S. 1908; Session Laws 1861, page 57.

"Whenever any county shall be organized hereafter, the qualified voters thereof are hereby empowered to select the place of their county seat by a vote at the first election held in the county for the choice of county officers. For that purpose each voter may designate in his ballot the place of his choice for the county seat; and when the votes are canvassed the place having a majority of all the votes polled shall be the county seat; * * * § 1166, R. S. 1908; Session Laws 1861, page 151."

These sections contain the law then in existence for the locating of county seats. The legislature of 1861 also passed an act on the question of removing or changing a county seat, which reads as follows:

"Whenever the legal voters of any county are desirous of changing their county seat, at any time, upon petition being presented to the county commissioners, signed by a majority of them, to be ascertained by said commissioners, it shall be the duty of such commissioners to require the sheriff in giving the notice for the next county election, to notify said voters to designate upon their ballots, at said election, the place of their choice; and if upon canvassing the votes polled or given it shall appear that any one place has a majority of all the votes polled, such place shall be the county seat, * * * " § 42, ch. XX, R. S. 1868.

Section 2 of article 14 of the constitution of the state, under the title "Counties", provides as follows:

"The general assembly shall have no power to remove the county seat of any county, but the removal of county seats shall be provided for by general law, and no county seat shall be removed unless a majority of the qualified electors of the county, voting on the proposition at a general election, vote therefor; and no such proposition shall be submitted oftener than once in four years, and no person shall vote on such proposition who shall not have resided in the county six months and in the election precinct

ninety days next preceding such election.''

Section 25 of article 5 provides, among other things:

''The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * locating or changing county seats;''

In 1881 the state legislature passed the following law: ''An Act to Regulate Elections for the Removal of County Seats. * * *

''Section 1. That whenever an election shall be ordered by the board of county commissioners of any county to ascertain the sense of the legal voters of such county upon the question of removal or location of the county seat of such county, it shall be the duty of such board of county commissioners to appoint special judges and registers of such elections, and to provide a special ballot box in each voting precinct, in which shall be deposited all the ballots cast at such election in such precinct on the question of location or removal of the county seat.

''Sec. 2. It shall be the duty of the judges and registers so appointed to make a special registration of the voters of each precinct, who have resided in the county at least six months, and in such precinct at least ninety days, prior to the day designated for holding such election, which day shall be the day designated by law for holding a general election and no other.

''Sec. 3. The election shall be held at the same places at which the general election is ordered to be held, but the vote for or against removal or location of the county seat shall be by special ballot, separate and distinct from the general ticket voted at said election, which ballot shall be deposited in the special ballot box, provided for in section 1st (one) of this act, and no vote shall be counted for or against said removal or location which is not deposited in such special ballot box as herein provided.

''Sec. 4. No county seat shall be removed until the expiration of the thirty days after the canvass of the votes had by the county canvassers upon the question of location or removal, nor until the board of county commissioners of such county shall have

made and entered of record on their journal an order directing such removal, which order the said board shall make within thirty (30) days after the county canvass is completed, unless enjoined or restrained from so doing by an order of the district court of said county or the judge thereof, or by the supreme court.

"Sec. 5. All laws now in force relating to elections shall apply to elections held upon the question of removal or location of county seats, except that the question of location of such county seat shall be contested in the district court of said county in the first instance, but may be removed to the district court of any other county under the provisions of the code relating to change of the place of trial, and shall be also subject to appeal or writ of error to the supreme court: *Provided,* that not less than two-thirds of all the legal votes cast shall be necessary to effect the removal of the county seat of any county in this state.

"Sec. 6. All laws governing contests of elections shall be held applicable to contests of county seat elections, except that the board of county commissioners of the county shall in all cases be the contestee, and that the contest shall be conducted in the district court of the proper county. Such district court or the judge thereof in vacation may appoint a referee to take testimony in relation to the grounds of contest alleged by the contestor, which referee may sit to take evidence in any precinct of his county."

Session Laws, 1881, page 103.

The contention on the part of plaintiffs in error, contestors, is that every legal voter, that is, every elector of Crowley County qualified to vote at a general election, was entitled to vote upon the question of locating the county seat, under the provisions of the territorial statutes, and that since the election was restricted or limited to that portion of the legal or qualified voters who had resided in the county six months and in the precinct ninety days, the constitutional and statutory rights of qualified electors were denied, and the integrity of the

election so affected as to render it illegal and void. On the other hand, it is contended that by the law of 1881 it was undertaken to legislate fully upon the subject, not only of the removal, but of the location of county seats, and that it provides a complete system for the regulation of elections upon both propositions, and that all prior conflicting legislative enactments were thereby repealed by implication.

At various times since the enactment of the law of 1881 there has been new legislation amendatory of the act of 1861, upon the question of removing or changing a county seat, heretofore quoted in this opinion and contained in the Revised Statutes of 1868 as paragraph 42, Chapter XX, which relates solely to the change of county seats. This occurred in 1885, again in 1891, and also in 1911. But none of these subsequent enactments in the least change or modify the law of 1881, so far as it relates to the permanent location of county seats. Now, if this law provides for the regulation of elections both for the change and for the permanent location of county seats, the election was properly held, but if the territorial statute, providing for the manner of the permanent location of county seats, is in force, at which election all electors qualified to vote at general elections can vote, then the election was improperly conducted and the result cannot be upheld.

We are thoroughly satisfied that the legislature intended by the provisions of this act to provide for the conduct of elections both as to the permanent location and the removal of county seats. The constitutional provisions quoted are still in force. By section 2 of article 14 of the constitution the people withheld authority from the general assembly to remove county seats, and precluded any one from voting on that question who had not resided in the county six months, and the precinct ninety days. By section 25 of article 5 the people prohibited the general assembly from passing any local or special law affecting, among other things, the location or change of county seats. Obviously it was pursuant

to these constitutional amendments that the general assembly adopted the act of 1881. It is general in its terms, is not open to the objection of being either local or special, and is its first expression upon the subject of location and removal of county seats, after the limitations and inhibitions fixed by the constitution. It was the plain intention of the legislature to establish by this act a uniform procedure regulating all elections concerning county seats, in harmony with constitutional provisions. The act is essentially different in many respects from all former legislation upon this subject. It requires the appointment of special judges and registers of election and the use of separate ballot boxes; provides for six months' residence in the county, and ninety days' residence in the precinct, as a qualification to vote upon such question; and contains new and additional matter in that it, for the first time, provides for contest of election upon the question of either removal or location of county seats, and designates the court which shall have jurisdiction to hear and determine such contests. Since the act is inconsistent with and repugnant to former legislation upon this subject, although it contains no repealing clause, it is well settled that, notwithstanding such omission, so much of former legislation as is in conflict with the later provisions is impliedly repealed.

In support of this proposition we quote from *Sedgwick*, in his work upon the construction of statutory and constitutional law, under the heading *"Repeals by Implication"*, page 104, as follows:

"But, on the other hand, it is equally well settled that a subsequent statute, which is clearly repugnant to a prior one, necessarily repeals the former, although it do not do so in terms; and even if the subsequent statute be not repugnant, in all its provisions, to a prior one, yet if the later statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act."

And again at the same page:

"It has been repeatedly declared that every statute is, by implication, a repeal of all prior statutes, so far as it is contrary and repugnant thereto, and that without any repealing clause."

Our own court, in *Edwards v. D. & R. G. R. Co.*, 13 Colo. 59, 21 Pac. 1011, spoke upon the same subject as follows:

"The fact that the latter statute does not in words refer to the earlier, but on the contrary purports to amend a different chapter, does not take away the repugnancy or alter the consequences arising therefrom. It is not absolutely necessary under the constitution that a repealing statute shall, either in its title or body, mention the statute repealed. Cooley, Const. Lim. 183."

In *District of Columbia v. Hutton*, 143 U. S. 18, 36 L. Ed. 60, 12 Sup. Ct. 369, it is said:

"We are not unmindful of the rule that repeals by implication are not favored. But there is another rule of construction equally sound and well settled which we think applies to this case. Stated in the language of this court in *United States v. Tynen*, 11 Wall. 88, 92, it is this: 'When there are two acts on the same subject the rule is to give effect to both if possible. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."

The above case is cited with approval and followed in a later case, *Henrietta Mining & Milling Co. v. Gardner*, 173 U. S. 123, 43 L. Ed. 637, 19 Sup. Ct. 327, in which is found the following statement quoted from *Henderson Tobacco Company*, 11 Wall. 657, 20 L. Ed. 235.

"Statutes are indeed sometimes held to be repealed by subsequent enactments, though the latter contain no repealing clauses. This is always the rule

when the provisions of the latter act are repugnant to those of the former, so far as they are repugnant. The enactment of provisions inconsistent with those previously existing manifests a clear intent to abolish the old law."

The supreme court of Michigan, in *Maynard v. Wesselius,* 117 Mich. 477, 76 N. W. 69, has stated the same rule in the following language; quoting from *State v. Mayor, etc.,* 40 N. J. L. 257:

" 'Every statute must be considered according to what appears to have been the intention of the legislature, and, even though two statutes relating to the same subject-matter are not in terms repugnant or inconsistent, if the latter statute is clearly intended to prescribe the only rule which should govern the case provided for, it will be construed as repealing the original act.' This statement is only the reiteration of the general rule laid down by text writers and the courts generally."

The words location and removal are not only used disjunctively throughout the act, but are employed in such a manner as to indicate conclusively that the legislature had clearly in mind both the subject of removal, and the subject of location of county seats. While it may be admitted that the title of a legislative act is often taken into consideration by the courts as an aid to the interpretation thereof, it is elementary that where there is no doubt as to the purpose of the act there is no room for interpretation, and as the body of this act is expressed in clear and unambiguous terms, there is no occasion to resort to the title to aid in its interpretation. Had the act been so worded as to render it in the least doubtful or inconsistent, or if ambiguity could be discovered in it, then resort might be had to its title to afford aid in determining its meaning. But since the real object of the statute is definite and certain, we need not go beyond the body of the act to seek information as to the legislative intent.

Upon the proposition that in aid of the interpretation of the statute its title should be resorted to only in

cases of uncertainty or ambiguity in the body of the act itself, numerous authorities might be cited, from which we select the following:

" 'The title is no part of an act and cannot enlarge or confer powers, or control the words of the act unless they are doubtful or ambiguous. (Citing cases) The ambiguity must be in the context and not in the title to render the latter of any avail.' *United States v. Oregon &c. Railroad,* 164 U. S. 526, 541. [41 L. Ed. 541, 17 Sup. Ct. 165] " *Cornell v. Coyne,* 192 U. S. 418, 430, [48 L. Ed. 504, 24 Sup. Ct. 383].

"In determining the meaning of a statute, courts will endeavor to ascertain the intention of the legislature in framing it. Although the title of the act will have its due share of consideration in the effort to determine the legislative intent, yet such title is not conclusive upon the subject of such intention. The intention of the legislature may be ascertained by considering the whole act, and construing one part by another, and one clause with reference to its connection with other clauses." *South Park Commissioners v. First National Bank,* 177 Ill. 234, 238, 52 N. E. 365, 366.

"But the modern doctrine is that when the language of the statute is ambiguous, the courts can resort to the title as aid in giving such act its true meaning, but that this cannot be done when the language used is clear and unambiguous." *State v. Patterson,* 134 N. Car. 612, 614, 47 S. E. 808.

It is contended by plaintiffs in error that constitutional and statutory rights and privileges are infringed by the act of 1881, because a longer residence in the county and precinct is prescribed to entitle one to vote at such elections than is prescribed to qualify electors to vote at general elections. The answer to this is that the constitution itself specifically reserves to the legislature the right to determine the length of residence in the county, city, town, ward or precinct which may be required as a qualification for voting, and it is impossible to conceive how a regulation on that subject could violate any constitutional right. The fact is that section 2 of

article 14 of the constitution provides that no person shall vote upon the proposition of removal of a county seat unless he shall have resided in the county six months and in the precinct ninety days prior to the election at which such proposition is submitted. Section 1 of article 7 of the constitution specifically reserves to the legislature the right to determine the length of residence required in the county, or precinct, as a qualification for voting. It therefore was purely a question for the legislature as to whether the same rule should be adopted as to residence in the case of an election to locate a county seat, as the constitution has already adopted in the case of an election upon the question of removal of a county seat. The length of residence required in the latter case was definitely fixed by the constitution, and the legislature was left free to determine the qualifications of voters at an election upon the question of the location of a county seat. Unquestionably, since there is no specific constitutional inhibition, and the statute is general applying alike to all similarly situated, the legislature had the power and authority to enact it. *Mayor, etc. v. Shattuck,* 19 Colo. 104, 34 Pac. 947, 24 Am. St. 208. It was a question of legislative policy pure and simple, with which the courts have nothing whatever to do. It may not, however, be amiss to suggest that many of the reasons which exist for requiring long residential qualifications to entitle electors to vote upon the question of removal of county seats are equally applicable upon the question of voting to locate county seats.

Incidentally it is urged that the act is unconstitutional, in that its subject is not sufficiently expressed in its title, which reads: "An Act to Regulate Elections for the Removal of County Seats." There seems no room to fairly doubt that the act was designed to provide both for elections for the change or removal and the permanent location of county seats. The title is broad and comprehensive enough to include elections for the removal of county seats whether temporarily or permanently estab-

lished. The question of the permanent location of a county seat involves, or may involve, the question of removal, as much as does the question of the change of a county seat, and indeed both involve, or may involve, the question of retention of a county seat. In short, the real purpose of the act is to provide for the regulation of election for the selection of county seats. If the title had been more specific and had referred to elections for the removal of county seats already permanently established, there might be force in this contention. But as the title stands it applies as well, considered from a practical standpoint, to the regulation of an election where the question of the removal of a county seat temporarily located is submitted, which is an election upon the question of the permanent location of a county seat, as to an election for the removal of a county seat already permanently located. The act by its title is confined to a single subject, namely, that of the selection or designation of county seats, and the very fact that the title is broad and comprehensive .in and of itself alone largely removes it from the constitutional objection urged, because any matter which may fairly be said to be germane to the main subject may be properly embraced in the act. It seems clear, upon a survey of the whole matter, that no member of the legislature could possibly have been misled or deceived by the language of this title, nor could any citizen of ordinary prudence be led astray by the fact that the title was not as definite and certain as exacting and critical counsel now insist that it should have been, which are among the chief evils intended to be met and overcome by this constitutional provision.

In the case of *Golden Canal Company v. Bright,* 8 Colo. 144, at page 149, 6 Pac. 142, 144, the following language upon this subject is used:

"The constitutional inhibition must receive a reasonable construction. It is enough if the bill treats of but one *general subject,* and that subject is expressed in the title; to require that each subdivision of the subject, each and every of the 'ends and

means necessary or convenient for the accomplishment of the object', must be specifically mentioned in the title, would greatly impede and embarrass legitimate legislation.  Judge Cooley asserts that it would 'actually render legislation impossible.'  Cooley, Const. Lim. 144.''

And in the case of *Board of County Commissioners of El Paso County v. Board of County Commissioners of Teller County,* 32 Colo. 310, 76 Pac. 368, this court reiterates upon this question a like doctrine in the following language:

"The constitutional inhibition invoked only requires that the title to an act clearly express its subject, and not its provisions or the details by which its object is to be accomplished.—*People ex rel. Crowell v. Lawrence,* 41 N. Y. 137.  Its mandate is observed if the legislation in the body of a statute is germane to the general subject expressed in the title of the act in which it appears.  The test in this respect is, whether such legislation is relevant or appropriate to such subject.—In re *Breene,* 14 Colo. 401 [24 Pac. 3]; In re *Pratt,* 19 Colo. 138 [34 Pac. 680]; *Edwards v. R. R. Co.,* 13 Colo. 59 [21 Pac. 1011]; *Mollie Gibson C. M. & M. Co. v. Sharp,* 23 Colo. 259 [47 Pac. 266].''

We reach the conclusion, therefore, that there was no error on the part of the court in refusing leave to contestators to amend, as purposed, also that the election was held under the proper statute and that the result must be upheld.  The trial court having reached a like conclusion, the judgment is affirmed.

*Judgment affirmed.*

Decision *en banc.*

Mr. JUSTICE WHITE not participating.