In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1999–2000 # 25,

John S. Outcelt, Petitioner,

v.

Douglas Bruce and Jeffrey Wright, Respondents,

and

Rebecca Lennahan and Richard Westfall, Title Board.

No. 98SA388.

Supreme Court of Colorado, En Banc.

Feb. 22, 1999.

Susan E. Burch, Denver, Colorado, Attorney for Petitioner.

Douglas Bruce, Pro Se, Colorado Springs, Colorado.

No appearance on behalf of Respondent Jeffrey Wright.

Ken Salazar, Attorney General, Michael E. McLachlan, Solicitor General, Barbara McDonnell, Chief Deputy Attorney General, Paul Farley, Deputy Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, Colorado, Attorneys for Title Board.

Justice RICE delivered the Opinion of the Court.

Petitioner, John S. Outcelt, brought these original proceedings under section 1–40–107(2), 1 C.R.S. (1998). Petitioner seeks review of the Title Board's (Board) September 2, 1998 action in fixing the titles, ballot titles and submission clauses, and summaries (titles and summaries) for three proposed ballot initiatives designated "1999–2000 # 25" (Initiative # 25), "1999–2000 # 26" (Initiative # 26), and "1999–2000 # 27" (Initiative # 27).[1] Because these initiatives are nearly identical, we consolidated the proceedings for review in this court.[2]

Petitioner argues that these initiatives are unconstitutional because: (1) the initiatives contain more than one subject; (2) the titles and summaries fail to express the true intent and meaning of the initiatives; (3) the titles and summaries are misleading and fail to reflect the true fiscal impact of the proposals; (4) the titles and summaries fail to conform with Article X, section 20(3)(c) of the Colorado Constitution; and (5) the titles and summaries contain a prejudicial catch phrase.

We agree with the first and second of the foregoing contentions because the Board has acknowledged that it cannot comprehend the initiative well enough to state its single sub-ject in the title. Accordingly, we reverse the Board's action.

## I.

Each of the initiatives at issue proposes to add a new paragraph (d) to subsection (8) of section 20 of Article X of the Colorado Constitution, which is commonly known as Amendment 1. Under Initiative # 25, the new paragraph (d) would read as follows:

A $25 tax cut, increased $25 yearly (to $50, $75 ...), shall lower each tax bill for each 2001 and later district: utility customer tax and franchise charge; vehicle ownership tax; yearly income tax; property tax spent on human and health services, economic development, retirement benefits, enterprises, authorities, courts, jails, libraries, schools, elections and district attorney, assessor, financial, and legal offices combined; income or property tax equal to the combined yearly cost of lease-purchases, unbonded obligations not paid or offset by a pledged cash reserve in the year created, tax-increment financing, tax and spending and future local debt increases voter-approved after 1992 that last more than 10 years after approval, excess revenue for more than one year per election, revenue increases voter-approved after 2000 above a fixed tax rate and a fixed maximum number of dollars yearly, and tax credits and rebates unless voter-approved, for overpayment, or for general refunds of excess or illegal revenue; income or property tax equal to prior year revenue above 99% of its spending limits; income or property tax equal to yearly revenue from a tax rate increased or a spending limit percentage, computed since 1992, exceeded from 1993 through 2000, except by a fixed tax rate and a voter-approved fixed maximum number of dollars yearly; income or property tax equal to yearly revenue of each authority wholly

---

1. The title and summary of Initiative # 25 are attached hereto as APPENDIX A. The title and summary of Initiative # 26 are attached hereto as APPENDIX B. The title and summary of Initiative # 27 are attached hereto as APPENDIX C. We also note that the initiative titles and summaries provided by the respondent differ slightly from the certified versions provided by the Secretary of State. We rely herein upon the language from the certified versions.

2. Cases 98SA415 and 98SA446 were consolidated for review herein.

or partly created by or related to the district but outside fiscal year spending limits, computed since 1992, and yearly cost of all state and local tax and business charge exemptions related to each authority and enterprise; and remaining business personal property tax. (8)(d) *does not require* specific ballot issue titles or content, does not apply to impair those binding contracts or debts existing in 2000, and does not increase state or local tax or spending limits; the state shall replace local tax cut revenue when the state has a fiscal year *revenue increase* from all sources of $200 million or more above that year's increase in local replacement, and shall audit each limit yearly; (8)(d) shall be strictly construed—substantial compliance is insufficient—and not balanced or harmonized with existing provisions; and all attorney fees and costs to enforce (8)(d) *shall always* be paid to successful plaintiffs only.

(Emphasis in original.)

The only difference in the new paragraph (d) under Initiative # 26 is that it contemplates an initial thirty dollar tax cut, increased by an additional thirty dollars each year thereafter. Initiative # 27 differs only insofar as it contemplates an initial twenty-five dollar tax cut, increased by an additional twenty-five dollars the next year, and increased by fifty dollars each year thereafter.

Under the instant initiatives, the new paragraph (d) would progressively lower various state and local taxes. This tax reduction would, in turn, reduce the revenue which municipalities, school districts, and various special districts depend upon to fund local programs such as human and health services, retirement benefits, district attorney and assessors offices, schools, libraries, courts, and jails. Under the terms of the instant initiatives, the state would only be required to replace the resultant shortfall in revenue for local programs in years when the state's fiscal year revenue exceeded the amount of the shortfall by $200 million or more.

## II.

The petitioner's first contention is that the instant initiatives contain multiple subjects in violation of Article V, section 1(5.5) of the Colorado Constitution. *See also* § 1–40–106.5, 1 C.R.S. (1998). Specifically, the petitioner contends that the initiatives include the following subjects: (1) the implementation of various state and local tax cuts; (2) a corresponding transfer of funding responsibility from the local government to the state government, which will result in the reduction of state spending on state programs; (3) the requirement to set ballot titles which fix maximum tax rates; and (4) the implementation of franchise fee cuts. The petitioner also contends that the titles and summaries set by the Board are misleading because they do not clearly express the single subject of the proposed initiatives. Given the interdependent nature of these arguments, we address them together.

### A.

A brief historical review of the single-subject and clear title requirements provides the necessary background for our decision. The single-subject and clear title concepts first arose in the context of bills proposed by the General Assembly and were a part of our state's first constitution. Article V, section 21 of the Colorado Constitution provides:

No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.

Thus, the express language of Article V, section 21 embraces two interdependent mandates: one forbidding the union of separate and distinct subjects in the same legislative bill, and the other commanding that the single subject treated in the body of the bill shall be clearly expressed in its title. *See In re Breene,* 14 Colo. 401, 404, 406, 24 P. 3, 3–4 (1890); *see also* Research Memorandum No. 2, "Bills to Contain Single Subject: No Change of Original Purpose," Colorado Legislative Drafting Office, Dec. 1971, at 6 (discussing how Article V, section 21 addresses

these two separate, but related, requirements). As the *Breene* court held:

> [the constitutional provision] embraces two mandates, vis.: one forbidding the union in the same legislative bill of separate and distinct subjects, and the other commanding that the subject treated in the body of the bill shall be clearly expressed in its title. Each of these mandates is designed to obviate flagrant evils connected with the adoption of laws. The former prevents joining in the same act disconnected and incongruous matters. The purpose of the latter is ... "to prevent the passage of unknown and alien subjects, which might be coiled up in the folds of the bill."

*In re Breene*, 14 Colo. at 404, 24 P. at 3–4 (citation omitted).

We first addressed the single-subject aspect of this constitutional provision in a trio of cases decided around the turn of the century. In 1890, we interpreted this provision to prohibit a single legislative act from addressing "disconnected and incongruous matters." *Id.* at 404, 24 P. at 3. Three years later, we held that the requirement that a bill be limited to a single subject serves the beneficent purpose of making each legislative proposal depend upon its own merits for passage and, therefore, forbids a bill from containing "subjects having no necessary or proper connection." *Catron v. Board of County Comm'rs*, 18 Colo. 553, 557, 33 P. 513, 514 (1893). Finally, we held in *People ex rel. Elder v. Sours*, 31 Colo. 369, 403, 74 P. 167, 177 (1903), that in order for the text of a bill to constitute more than one subject, it "must have at least two distinct and separate purposes which are not dependent upon or connected with each other."

Although we have not been frequently presented with the issue of whether proposed legislation contains more than one subject,[3] we have had occasion to apply the foregoing legal standard in two recent cases. In *Parrish v. Lamm*, 758 P.2d 1356, 1360 (Colo. 1988), we reviewed a statute which sought to prohibit health care providers from waiving their patients' obligations to pay insurance deductibles and copayments, and simultaneously advertising their willingness to waive these fees. This bill, which had been proposed by the legislature, was challenged as impermissibly containing two subjects: "the regular business practice of advertising a willingness to waive certain patient fees, and the related but separate crime of abuse of health insurance." *Id.* at 1362. Relying in part upon *Catron*, we concluded that the bill contained only one subject because the two matters encompassed by the bill were properly connected. *See Parrish*, 758 P.2d at 1362. "The act of advertising is simply one means of alerting patients that a health care provider is willing to waive payment of deductible and copayments." *Id.*

On the other hand, in *In re House Bill No. 1353*, 738 P.2d 371, 373 (Colo.1987), we reviewed legislation which sought to accomplish numerous goals including: the creation of a commission on information management to oversee strategic planning and set policy for the state's information systems; the imposition of a requirement that prisoners be charged for medical visits; the elimination of the use of salary surveys by the state personnel department to determine comparable pay rates for state employees; the repeal of a statute entitling old age pensioners to receive additional payments during the winter months to defray increased heating expenses; the amendment of a statute for Medicaid reimbursement to nursing homes; and the adoption of provisions that would allow banks to dispose of intangible property in their possession and to subsequently credit the proceeds from same to the state. The General Assembly argued that this bill contained one subject—the "increase in the moneys

---

3. We have considered challenges to bills on many occasions on the ground of noncompliance with Article V, section 21 of the Colorado Constitution. The great majority, however, have focused principally on the sufficiency of the title to describe the contents of the bill. *See, e.g., Goldberg v. Musim*, 162 Colo. 461, 427 P.2d 698 (1967); *California Co. v. State*, 141 Colo. 288, 348 P.2d 382 (1959); *Gordon v. Wheatridge Water Dist.*, 107 Colo. 128, 109 P.2d 899 (1941); *Titus v. Titus*, 96 Colo. 191, 41 P.2d 244 (1935); *Lowdermilk v. People*, 70 Colo. 459, 202 P. 118 (1921); *Sugar City v. Board of Comm'rs*, 57 Colo. 432, 140 P. 809 (1914); *People ex rel. Colorado Bar Ass'n v. Erbaugh*, 42 Colo. 480, 94 P. 349 (1908); *Brown v. Elder*, 32 Colo. 527, 77 P. 853 (1904).

available to the state ... for the purpose of providing moneys to fund certain designated expenditure priorities for the 1987 regular session." *Id.* However, we held that "it would strain logic to conclude that the matters encompassed by House Bill No. 1353 are necessarily or properly connected to each other, *see Catron,* 18 Colo. at 557, 33 P. at 514, rather than disconnected or incongruous, *see In re Breene,* 14 Colo. at 404, 24 P. at 3." *In re House Bill No. 1353,* 738 P.2d at 373.

Turning to the background of the clear title aspect of the constitutional provision, we likewise first interpreted this mandate over 100 years ago in *In re Breene.* In that case, the state treasurer was criminally charged with lending public moneys for private gain. In his defense, the treasurer challenged the constitutionality of the statute under which he had been charged and ultimately convicted by the trial court, claiming that the title of the act, namely "An act to provide for the assessment and collection of revenue, and to repeal certain acts in relation thereto," did not clearly express the subject matter. *See id.* at 403, 24 P. at 3. The court agreed with Treasurer Breene, and vacated his conviction. *See id.* at 408, 24 P. at 5. In the course of its discussion, the *Breene* court established the standard for evaluating the clarity of titles, to wit:

> It will not do to say that the general subject of legislation may be gathered from the body of the act, for, to sustain the legislation at all, it must be expressed in the title. Moreover, we are bound to assume that the word "clearly" was not incorporated into the constitutional provision under consideration by mistake. It appears in but few of the corresponding provisions of other state constitutions; a fact that could hardly have been unobserved by the convention. That this word was advisedly used, and was intended to affect the manner of expressing the subject, we cannot doubt. The matter covered by legislation is to be "clearly," not "dubiously" or "obscurely," indicated by the title. Its relation to the subject must not rest upon a merely possible or doubtful inference. The connection must be so obvious as that ingenious reasoning, aided by superior rhetoric, will not be necessary to reveal it. Such connection should be within the comprehension of the ordinary intellect, as well as the trained legal mind.

*Id.* at 406, 24 P. at 4; *see also Parrish,* 758 P.2d at 1363; *Sullivan v. Siegal,* 125 Colo. 544, 551–52, 245 P.2d 860, 863–64 (1952); *Lowdermilk v. People,* 70 Colo. 459, 463, 202 P. 118, 119 (1921); *Lamar Canal Co. v. Amity Land & Irrigation Co.,* 26 Colo. 370, 374, 58 P. 600, 601 (1899); *Brooks v. People,* 14 Colo. 413, 417, 24 P. 553, 554 (1890).

### B.

The citizens of Colorado have enjoyed the right to initiate and pass constitutional amendments and laws since 1910. *See* Richard B. Collins & Dale Oesterle, *Structuring the Ballot Initiative: Procedures That Do and Don't Work,* 66 U. Colo. L.Rev. 47, 65 (1995). Since this time, there have been over 160 ballot initiatives to amend the constitution and approximately sixty ballot initiatives to enact laws. *See id.* at 66. However, more than one-half of the total of all initiatives proposed since 1910 were promulgated after 1976. *See id.* at 66–67.

In response to this proliferation of initiative activity, the General Assembly amended the statutes governing the initiative process in their entirety in 1993. *See* Act effective May 4, 1993, ch. 183, 1993 Colo. Sess. Laws 676; *see also* Collins & Osterle, 66 U. Colo. L.Rev. at 68–69. Therein, the General Assembly sought to "properly safeguard, protect, and preserve inviolate for [the citizens] these modern instrumentalities of democratic government." § 1–40–101, 1 C.R.S. (1998). As a part of this amended article, the General Assembly incorporated, among other things, the clear title standards that we first discussed in *Breene:*

> In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear.

§ 1–40–106(3)(b), 1 C.R.S. (1998). This revised article also authorized the Secretary of State to convene a Title Board consisting of

the Secretary of State, the Attorney General, and the Director of the Office of Legislative Legal Services. *See* § 1–40–106(1), 1 C.R.S. (1998).

The following year, in 1994, the General Assembly sought to extend the single-subject/clear title limitation applicable to bills to proposed initiatives by way of a referred constitutional amendment.[4] The language of the proposed amendment mirrored the language of Article V, section 21 of the Colorado Constitution insofar as it sought to prohibit initiatives from containing more than a single subject, which subject must be expressed clearly, to wit:

> No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title. . . . If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

Colo. Const. art. V, § 1(5.5); *see also* § 1–40–106.5. This single-subject/clear title provision was passed by the electorate as a constitutional amendment to the initiative process, a power reserved to the people by Article V, section 1(1) of the Colorado Constitution.

Finally, effective July 19, 1995, the General Assembly enacted legislation that explained its rationale for extending the single-subject/clear title requirement to initiated and referred measures. *See* § 1–40–106.5. This legislation stated that "in setting titles pursuant to section 1(5.5) of Article V, the initiative title setting review board created in section 1–40–106 *should apply judicial decisions construing the constitutional single-subject requirement for bills* . . . ." § 1–40–106.5(3) (emphasis added).[5] In so stating, the General Assembly reiterated its intent that the standards developed for the analysis of bills

as discussed above be applied to the interpretation of citizen initiatives.

We first interpreted the new constitutional provision in *In re Proposed Initiative on "Public Rights in Waters II,"* 898 P.2d 1076 (Colo.1995). Mindful of the legislative history which requires us to evaluate the single-subject/clear title mandate in initiatives in the same way that we evaluate single subjects and clear titles in bills, we relied upon the standard that we had established in *Sours, Catron,* and *Breene.* After applying this standard, we held that an initiative violates the single-subject requirement when it (1) relates to more than one subject and (2) has at least two distinct and separate purposes which are not dependent upon or connected with each other. *See In re "Public Rights in Waters II,"* 898 P.2d at 1078–79; *see also In re Proposed Initiative on Petition Procedures,* 900 P.2d 104, 109 (Colo. 1995).

However, our analysis did not end with our articulation of the foregoing two-part test. We further stated that an initiative which tends to effect or to carry out one general objective or purpose presents only one subject. *See In re "Public Rights in Waters II,"* 898 P.2d at 1079. On the other hand, an initiative which addresses subjects that have no necessary or proper connection to one another will be disallowed as containing more than one subject. *See id.* at 1078–79. This interpretation of the single-subject requirement of Article V, section 1(5.5) ensures that each proposed initiative "depends upon its own merits for passage." *Id.* at 1078.

Since our decision in *In re "Public Rights in Waters II,"* we have consistently applied the foregoing standard to a variety of initiative proposals in order to analyze whether a proposed initiative contains more than one subject. For example, we found multiple

---

4. The General Assembly referred this constitutional amendment to the voters as Referendum A on the 1994 general election ballot. It was approved and became effective upon proclamation by the Governor on January 19, 1995. *See* Sen. Conc. Res. 93–4, 1993 Colo. Sess. Laws 2152; *see also In re Proposed Initiative on "Public Rights in Waters II,"* 898 P.2d 1076, 1078 (Colo. 1995).

5. We note that the recent Supreme Court decision in *Buckley v. American Constitutional Law Foundation, Inc.,* —— U.S. ——, 119 S.Ct. 636, 637, 142 L.Ed.2d 599 (1999), recognized the existence of the single-subject limitation upon initiatives set forth at section 1–40–106.5(1)(a). However, the Court did not address the nature of the single-subject requirement because it was not at issue between the parties.

subjects in *In re Petition Procedures,* 900 P.2d at 109 (holding that proposed initiative included such diverse subjects as retroactive fundamental rights, judicial review of petitions, recall, referendum, and initiative petition procedures); *In re Amend Tabor 25,* 900 P.2d 121, 125 (Colo.1995) (noting that proposed initiative not only proposed a tax credit, but also set forth several procedural requirements for future ballot issues); and *In re Proposed Initiative for 1997–1998 # 64,* 960 P.2d 1192, 1197–1200 (Colo.1998) (holding that proposed initiative not only established qualifications for judicial officers, but also impermissibly established a minimum number of district judgeships to which a particular district is entitled, proposed the repeal of Article VI, section 26 of the Colorado Constitution, included an immunity provision conferring absolute immunity upon individuals who criticized a judicial officer's qualifications outside a courtroom, and included provisions divesting the Commission on Judicial Discipline of its investigative and remedial powers and changing qualifications for Commission membership).

On the other hand, we found single subjects in *In re Amend Tabor No. 32,* 908 P.2d 125, 129 (Colo.1995) (upholding proposed initiative that included a tax credit for six state and local taxes, where single purpose of initiative was implementation of tax credit, all six taxes were connected to same tax credit and were bound by same limitations, and initiative provision requiring mandatory replacement of lost local government revenues was dependent upon and closely connected to the tax credit); *In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127, 1131 (Colo.1996) (upholding proposed initiative that sought to establish parents' rights of control of their children in four distinct areas: upbringing, education, values, and discipline); and *In re Proposed Initiative for 1997–1998 # 74,* 962 P.2d 927, 929 (Colo.1998) (upholding proposed initiative creating school impact fees on new construction, although initiative also specified that payment or ex-

emption from fees would be resolved by school boards or by current law governing use of school initiatives and referenda).

Turning next to the companion requirement that the title clearly state the single subject of the initiative, here again, we have applied the standards applicable to bills. In doing so, we have implemented the General Assembly's directives for initiatives as set forth in both section 1–40–106(3)(b) and Article V, section 1(5.5).[6]

For example, we held a title to be clear in *In re Proposed Initiative Concerning "Automobile Insurance Coverage,"* 877 P.2d 853, 856–57 (Colo.1994) (rejecting clarity challenge to title of proposed initiative that did not contain specific provisions establishing a particular automobile insurance pool system, but which instead required the General Assembly to create such a system).

In contrast, we held titles to be unclear in *In re Proposed Initiative on Limited Gaming in Antonito,* 873 P.2d 733, 741 (Colo. 1994) (holding that title was misleading since a voter scanning the initiative could be misled into believing that the measure concerned only one city, even though the proposed initiative also changed provisions applicable to other areas of the state where limited gaming was lawful); *In re Proposed Initiative on "Obscenity,"* 877 P.2d 848, 850 (Colo.1994) (holding that the title permitting state and local entitles to "control the promotion of obscenity to the full extent permitted by the First Amendment to the U.S. Constitution" did not contain sufficient information to enable electorate to ascertain that the proposed initiative intended to foreclose Colorado courts from permitting any broader protection of obscenity under the Colorado Constitution); and *In re Proposed Initiative 1996–17,* 920 P.2d 798, 803 (Colo.1996) (holding that title was misleading to extent that it failed to disclose that a proposed initiative that would require revision of current enhanced emissions testing program would af-

---

**6.** *In re "Public Rights in Waters II"* offers the following important guidance for our application of the clear title mandate, to wit:

> Again, this requirement parallels the same requirement in Article V, Section 21, concerning the single subject requirement for bills and is intended to prevent voter surprise or uninformed voting caused by items concealed within a lengthy or complex proposal.
>
> *Id.* at 1079.

fect only the six-county Denver metropolitan area).

## C.

In order to facilitate the initiative process, the General Assembly assigned duties to the Title Board which include: (1) "designat[ing] and fix[ing] a proper fair title for each proposed law or constitutional amendment, together with a submission clause," § 1–40–106(1); (2) "prepar[ing] a clear, concise summary of the proposed law or constitutional amendment" which "shall be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure," § 1–40–106(3)(a), 1 C.R.S. (1998); (3) "consider[ing] the public confusion that might be caused by misleading titles and ... whenever practicable, avoid[ing] titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear," § 1–40–106(3)(b); (4) not permitting "the treatment of incongruous subjects in the same measure," § 1–40–106.5(1)(3)(I); and (5) acting to "prevent surreptitious measures and appris[ing] the people of the subject of each measure by the title" in order to "prevent surprise and fraud from being practiced upon voters," § 1–40–106.5(1)(e)(II). *See also Aisenberg v. Campbell,* 972 P.2d 257, 260 (Colo. 1999).

■■■■ Thus, the General Assembly has squarely placed the responsibility for carrying out the dual mandate of Article V, section 1(5.5) on the Title Board. Implementation of this mandate often requires the Board to balance competing interests. For example, the Board must assist potential proponents in implementing their right to initiate laws, *see In re Proposed Initiative Concerning Drinking Age in Colorado,* 691 P.2d 1127, 1130 (Colo.1984), while concurrently protecting the voters against confusion and fraud. Likewise, the Board must give deference to the intent of the proposal as expressed by its proponent, *see In re Proposed Initiative on Unsafe Workplace Env't,* 830 P.2d 1031, 1034 (Colo.1992), without neglecting its duty to consider the public confusion that might result from misleading titles. However, if the Board cannot comprehend a proposed initiative sufficiently to state its single subject

clearly in the title, it necessarily follows that the initiative cannot be forwarded to the voters.

■■■■ This is especially true in light of the limited scope of our review of actions taken by the Board. For example, we may not address the merits of a proposed initiative, nor may we interpret its language or predict its application. *See In re Petition on Campaign & Political Fin.,* 877 P.2d 311, 313 (Colo.1994); *In re Proposed Initiative on Fair Treatment of Injured Workers,* 873 P.2d 718, 719–20 (Colo.1994); *In re Proposed Election Reform Amend.,* 852 P.2d 28, 31–32 (Colo.1993). Further, in conducting such a review, the actions of the Board are presumptively valid. *See Say v. Baker,* 137 Colo. 155, 159, 322 P.2d 317, 319 (1958); *see also In re Proposed Initiative for 1997–1998 No. 105,* 961 P.2d 1092, 1097 (Colo.1998); *In re Proposed Initiative for 1997–1998 No. 75,* 960 P.2d 672, 673 (Colo.1998); *In re Proposed Initiative "Automobile Insurance Coverage,"* 877 P.2d at 856 (noting that reviewing court is required to engage all legitimate presumptions in favor of the propriety of the Board's actions).

## D.

Finally, for the purpose of general background, we note that two prior versions of these initiatives have been presented to us for review. In April 1998, we issued an opinion regarding Initiative # 30, the first version of the instant initiatives. *See In re Proposed Initiative for 1997–98 # 30,* 959 P.2d 822 (Colo.1998). Therein, we held that Initiative # 30 was unconstitutional because it contained two subjects—a tax cut and new criteria for voter approval of revenue and spending increases. *See id.* at 827. In June 1998, we reviewed redrafted versions of the initiatives, entitled Initiatives # 84 and # 85. *See In re Proposed Initiative for 1997–98 No. 84,* 961 P.2d 456 (Colo.1998). Initiatives # 84 and # 85 did not include the language that we found objectionable in Initiative # 30. We held, however, that the redrafted initiatives were unconstitutional because they contained more than one subject—namely, tax cuts and the imposition of mandatory

reductions in state spending on state-sponsored programs. *See id.* at 457, 460–61. Our decisions in these cases serve as controlling precedent which governs not only the courts of Colorado, but also the Title Board. *See* § 1–40–106.5(3).

### III.

Turning to an analysis of the initiatives now before us, the petitioner contends that the instant initiatives still contain multiple subjects. First, the petitioner argues that these initiatives involve the following discrete subjects: (1) tax cuts, (2) a transfer of funding responsibility which will necessarily result in a reduction in state spending on state programs, and (3) the addition of new criteria for voter approval of revenue and spending increases pursuant to Amendment 1 of the Colorado Constitution. Second, the petitioner argues that the titles of the initiatives do not clearly express the single subject of the measures.

### A.

In support of the petitioner's assertion that the instant initiatives will result in a reduction of state spending on state programs, he directs our attention to language in the initiatives which not only requires the state to "replace local tax cut revenue when the state has a fiscal year revenue increase from all sources of $200 million or more above that year's increase in local replacement," but also prohibits the state from "increas[ing] state or local tax or spending limits." In essence, the petitioner argues that, although the text of the instant initiatives has changed, the initiatives again will reduce state spending on state programs, our concern in *In re Proposed Initiative No. 84*, 961 P.2d 456, because the state will not be able to meet its obligations to fund local programs by raising taxes.

In contrast, the respondents argue that the initiatives presently before us differ from Initiative # 84 insofar as no shift in funding obligations occurs unless the state realizes a revenue increase of at least $200 million. As such, the respondents argue that state replacement of local revenue is not automatic and, therefore, no reduction of state spending on state programs will result. In short, respondents assert that the initiatives have only one objective or purpose—cutting taxes.

In light of the foregoing arguments, we must begin with a review of our holding in *In re Proposed Initiative No. 84*, 961 P.2d 456.[7] As noted above, Initiative # 84 was substantially similar to the instant initiatives insofar as it required a transfer of funding responsibility from the local government to the state government. Initiative # 84 also required the state to "replace monthly the local government revenue affected by the tax cuts established by this measure, *within all tax and spending limits.*" *In re Proposed Initiative No. 84*, 961 P.2d at 459 (emphasis added). In reviewing Initiative # 84, we recognized that the foregoing "within all tax and spending limits" provision included the spending and revenue limits imposed by Amendment 1.[8] *See id.* at 460. In light of this fact, we found that Initiative # 84 would require the state to reduce the amount it spent on state programs in order to replace lost local revenue as a result of the tax cuts. *See id.* We held that this mandatory reduction in state spending on state services constituted a separate and unrelated subject in violation of Article V, section 1(5.5) of the Colorado Constitution. *See id.* at 460–61.

The initiatives presently before us do not include the proviso that we found objectionable in *In re Proposed Initiative No. 84*. However, the instant initiatives include the language: "(8)(d) . . . does not increase state or local tax or spending limits. . . ." Therefore, the question we must decide is whether

7. Due to the nearly identical language of Initiatives # 84 and # 85, we limit our discussion to Initiative # 84.

8. Amendment 1 strictly limits increases in the state's annual spending and revenue collection. *See* Colo. Const. art. X, § 20(4)–(8). The state's maximum annual increase in spending is tied to

the amount by which inflation and population increase. *See* Colo. Const. art. X, § 20(7)(a). Without voter approval, the state may not impose any new tax, tax rate increase, or mill levy above that for the prior year. *See* Colo. Const. art. X, § 20(4); *see also In re Proposed Initiative No. 84*, 961 P.2d at 460.

these initiatives, given the $200 million revenue cushion before which the state's obligation to fund local programs begins, still have the consequence of reducing state funding to state programs. If, under these initiatives, state funding to state programs is reduced, then the resolution of this case is controlled by our decision in *In re Proposed Initiative No. 84*, 961 P.2d 456, since these initiatives would contain two subjects. On the other hand, if state funding to state programs is not reduced, then it follows that the initiatives contain only one subject. Based on our decision regarding the number of subjects in the proposed initiatives, we must secondarily determine whether the titles clearly state the single subject of the initiatives.

■ Our review of the Board's proceedings reveals that the Board did not determine whether the initiatives encompassed dual subjects. Rather, the record demonstrates that the Board was unable to ascertain the meaning of the initiatives well enough to address the question of whether the initiatives might have the consequence of reducing state spending on state programs. Finally, the record reveals that the Board's failure to resolve this ambiguity rendered the Board incapable of setting clear titles that would not mislead the electorate. Accordingly, we reverse the Board's actions.

### B.

In light of the legislative directive that requires the Board to apply our prior decisions, the Board's first responsibility was to determine whether these initiatives would reduce state spending on state programs even after the addition of the new $200 million dollar cushion language. The Board failed to resolve this seminal question.

The transcript of the hearings before the Board evidences the fact that the Board members recognized the potential shortcomings of the proposed initiatives. Specifically, the Chairman of the Board stated:

> Mr. [Proponent] in defense of both the title setting process here and—and the comments that you are make—making, I think it's critically important that you un-

derstand that we can take this matter that you have here before us today [the proposed initiative]—*we could go out and walk and talk to any twenty people on the street and they would have an almost impossible time trying ... to figure [the proposed initiative] out.* And one of the difficulties we have with your measures, Mr. [Proponent], and we're trying to bend over backwards to be accommodating to you, but *we have to try to understand them and you—the way you write them they are extremely difficult to understand. ...*

Tr. of Board Hearing at 60 (Sept. 2, 1998) (emphasis added). Similarly, at a later point in the hearing, another Board member stated:

> I just want to comment on the complexity [of the proposed initiatives] as well before we –before we get into that. It—*it makes it virtually impossible to determine what the—what the single subject ramifications of this [proposed initiative] are because of the complexity,* but I think it's incumbent on us to go forward and do it.
>
> . . . .
>
> ... I think *there's probably a fairly [decent] argument that that second sentence does include a potential violation of the single subject rule* in the hypothetical that involves the federal funds.

Tr. of Board Hearing at 80 (Sept. 2, 1998) (emphasis added).

This Board member's recognition of the fact that the proposed initiatives may contain multiple subjects is particularly significant for purposes of our review. However, after acknowledging the potential violation of the single-subject requirement, the record reveals that the Board made no effort to resolve this discrepancy. Instead, the Chairman of the Board summarily concluded that "a contraction in ... state expenditures ... does not appear to be the case ... or a very likely outcome [of the proposed initiatives]." Tr. of Board Reh'g at 48 (Sept. 16, 1998).

■ In the interest of extending all presumptions in favor of the Board's determination that these initiatives contained only one subject, we turn to the summary of the pro-

posed initiatives. However, the text of the summary offers no support for the Board's conclusion that the addition of the $200 million cushion eliminated the secondary subject that we found to exist in our review of Initiative # 84. In fact, the following language from the "state impacts" portion of the summary appears to confirm the concerns expressed by the Board members at the hearings, to wit:

> If the state replaces local government revenue losses resulting from the measure, the measure would have a significant but indeterminate negative fiscal impact on the state. Assuming no state replacement of local revenue, the measure would have a net negative state fiscal impact of at least $255,748,000 [9] during the three-year period beginning with fiscal year 2001–02. The figure does not include the amount of negative fiscal impact that will occur but is indeterminate at this time.

This statement that the instant initiatives will, at least in certain years, result in a negative fiscal impact does not square with the Board's implicit conclusion that the addition of the $200 million cushion eliminated what we found to be a secondary subject in our review of Initiative # 84. As the foregoing excerpt from the summary correctly notes, it is impossible to foresee whether the state will be required to reduce state spending on state programs in every year, in no year, or only in some years. Thus, in finding that the instant initiatives contained only one subject, the Board erred in concluding that the new language cured the deficiency we noted in *In re Proposed Initiative No. 84*.

Similarly, the petitioner asserts that the instant initiatives contain more than one subject insofar as they add new criteria for voter approval of revenue and spending increases pursuant to Amendment 1 of the Colorado Constitution. We first addressed the issue of additional criteria for voter approval of revenue and spending increases in *In re Proposed Initiative for 1997–98 # 30*, 959 P.2d 822 (Colo.1998).

However, as was the case with the Board's failure to apply our holding in *In re Proposed Initiative No. 84*, the record also reveals that the Board failed to apply our holding in *In re Proposed Initiative # 30*, 959 P.2d 822. As one member of the Board noted:

> [O]n the other point the—the Number 30 case, I—*I am still very confused about the ... affect [sic] of the change in the language and whether or not the Number Thirty case would in fact, indicate that we've still got a violation of single subject.* But, in view of my confusion—again and my feeling is that we should probably go forward and set the title because I think that it's going to take more time than we have today to try and unravel all of that confusion.

Tr. of Board Hearing at 81 (Sept. 2, 1998) (emphasis added). The Chairman of the Board then stated:

> I share your concerns, but I also share your views of—of our role here as the title setting board and our obligations to resolve –benefits of the doubt in favor of the proponents of the measure, so I'm prepared to say it's a single subject as well at this point and move forward.

Tr. of Board Hearing at 81 (Sept. 2, 1998). Instead of working through its confusion as to whether this issue constituted a separate subject, the Board simply left this question unresolved for appellate review. This practice was in derogation of the Board's duty under section 1–40–106.5(1)(3)(I).

Moreover, the Board's uncertainty as to whether the instant initiatives contained multiple subjects necessarily leads us to the conclusion that the title does not satisfy the long-standing requirement that it "clearly" state the single subject proposed by the initiatives. Before a clear title can be written, the Board must reach a definitive conclusion as to whether the initiatives encompass multiple subjects. *See In re Breene*, 14 Colo. at 406, 24 P. at 4 (noting that the title of an initiative cannot rest upon a merely possible or doubtful inference). Absent a resolution of whether the initiatives contain a single

---

9. Under Initiative # 26, this figure is $305,490,-000. Under Initiative # 27, this figure is $293,-030,000.

subject, it is axiomatic that the title cannot clearly express a single subject. *See* Colo. Const. art. V, § 21.

The record of the hearings before the Board demonstrates that the Board believed its duty to assist potential proponents in implementing their right to initiate laws, *see In re Proposed Initiative Concerning Drinking Age in Colorado,* 691 P.2d at 1130, included resolving all ambiguities in favor of the proponents herein. While the Board must give deference to a proponent's expression of his or her initiative's intent, *see In re Proposed Initiative on Unsafe Workplace Env't,* 830 P.2d at 1034, it may not do so at the expense of its other equally important duties. The Board must simultaneously consider the potential public confusion that might result from misleading titles and exercise its authority in order to protect against such confusion.

In sum, the Board, whether out of perceived time constraints or a misunderstanding of the scope of the deference to be given to a proponent of an initiative, has not submitted for our review titles which take into account the public confusion that might be caused by misleading titles. Instead, the Board has submitted to us titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *See generally* § 1–40–106(3)(b); *see also In re Proposed Initiative on "Obscenity,"* 877 P.2d at 850–51. In cases such as this one, where the Board has acknowledged that it cannot comprehend the initiatives well enough to state their single subject in the titles, we hold that the initiatives cannot be forwarded to the voters and must, instead, be returned to the proponent.

When writing future titles, the "connection between the title and the initiative must be so obvious as that ingenious reasoning, aided by superior rhetoric, will not be necessary to understand it." *Breene,* 14 Colo. at 406, 24 P. at 4. Further, such connection should be within the comprehension of voters of average intelligence. *See id.; see also Parrish,* 758 P.2d at 1363; *Sullivan,* 125 Colo. at 551–52, 245 P.2d at 863–64; *Lowdermilk,* 70 Colo. at 463, 202 P. at 119; *Lamar Canal Co.,* 26

Colo. at 374, 58 P. at 601; *Brooks,* 14 Colo. at 417, 24 P. at 554. Finally, it bears emphasis that the Board must follow the express mandate of the General Assembly, which stated that "in setting titles pursuant to section 1(5.5) of article V, the initiative title setting review board ... *should apply judicial decisions construing the constitutional single-subject requirement for bills....*" § 1–40–106.5(3) (emphasis added).

### IV.

As the Board not only failed to apply our holding in the *Initiative No. 84* decision, but also failed to write a title which clearly expressed a single subject, we remand this matter to the Board with directions to strike the title, ballot title and submission clause, and summary for Initiatives # 25, # 26, and # 27 and to return the initiatives to the proponents.

### APPENDIX A

### PROPOSED INITIATIVE NUMBER "1999–2000 # 25" [10]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION ESTABLISHING A $25 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $25 YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT

---

10. Amend TABOR.

DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION ESTABLISHING A $25 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $25 YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY?

The summary prepared by the Board is as follows:

This measure amends article X, section 20 of the Colorado Constitution, by adding a new paragraph (d) to subsection (8). A $25 tax cut increased $25 each year thereafter, would lower each state and local tax bill for each utility customer tax and franchise charge; vehicle ownership tax; yearly income tax; property tax spent on human and health services, economic development, retirement benefits, enterprises, authorities, courts, jails, libraries, schools, elections, and district attorney, assessor, financial, and legal offices combined; income or property tax equal to the combined yearly cost for lease-purchases, unbonded obligations not paid or offset by a pledged cash reserve in the year created, tax-increment financing, tax and spending and future local debt increases approved by voters after 1992 that last more than 10 years after approval, excess revenue for more than one year per election, revenue increases voter-approved after 2000 above a fixed tax rate and a fixed maximum number of dollars yearly, and tax credits and rebates unless voter-approved, for overpayment, or for general refunds of excess or illegal revenue; income or property tax equal to the prior year's revenue above ninety-nine percent of its spending limits; income or property tax equal to yearly revenue from a tax rate increased or a spending limit percentage, computed since 1992, exceeded from 1993 through 2000, except by a fixed tax rate and a voter-approved fixed maximum number of dollars yearly; income or property tax equal to the yearly revenue of each authority wholly or partly created by or related to the district by outside fiscal year spending limits, computed since 1992, and the yearly cost of all state and local tax and business charge exemptions related to each authority and enterprise; and remaining business personal property tax. The initial tax cut of $25 is applied to tax bills for tax year 2001.

The measure specifies that it does not require any specific ballot issue title or content, does not impair binding contracts or debts existing in 2000, and does not increase state or local tax or spending limits. The state is required to replace the local government revenue affected by the tax cuts established by this measure when the state has a fiscal year revenue increase from all sources of $200 million or more above that year's increase in the amount of local revenue to be replaced. The state is required to audit each tax and spending limit yearly. The measure provides that it is to be strictly construed and not balanced or harmonized with existing provisions. Substantial compliance with the

measure is not sufficient. All attorney fees and costs are always awarded to successful plaintiffs only who seek to enforce this new measure.

*State impacts.* The state income tax cut would reduce the growth in state general fund revenue by $256,648,000 during the three-year period beginning with fiscal year 2001–02. The cut in the state utility customer tax and other income tax cuts contained in the measure would reduce the growth in state general fund revenue by an indeterminate amount during the same three-year period.

The state would incur costs of at least $1,100,000 to administer the tax cuts allowed by this measure. In addition, the state may incur costs for possible annual audits, but the amount of these additional costs is indeterminate.

If the state replaces local government revenue losses resulting from the measure, the measure would have a significant but indeterminate negative fiscal impact on the state. Assuming no state replacement of local revenue, the measure would have a net negative state fiscal impact of at least $255,748,000 during the three-year period beginning with fiscal year 2001–02. The figure does not include the amount of negative fiscal impact that will occur but is indeterminate at this time.

*Local impacts.* If the state does not replace local government revenue lost due to the measure, the measure would have a significant negative fiscal impact on local governments. Even if the state replaces lost local government revenues, the measure may have a negative fiscal impact on some local governments, since the measure does not increase local tax and spending limits and revenues are currently being collected outside those limits. This measure may increase local government costs due to possible accounting and audit costs, attorney fees and costs that must be mandatorily awarded, and possible increased litigation. The amount of these additional local costs is indeterminate.

September 2, 1998

11. Amend TABOR.

Hearing adjourned 4:14 p.m.

Rehearing, September 16, 1998

Motion for Rehearing from Douglas Bruce Granted in Part

Motion for Rehearing from John Outcelt Denied

Hearing adjourned 3:08 p.m.

## APPENDIX B

### PROPOSED INITIATIVE NUMBER "1999–2000 # 26" [11]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION ESTABLISHING A $30 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $30 YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION

ESTABLISHING A $30 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $30 YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY?

The summary prepared by the Board is as follows:

This measure amends article X, section 20 of the Colorado Constitution, by adding a new paragraph (d) to subsection (8). A $30 tax cut, increased $30 each year thereafter, would lower each state and local tax bill for each utility customer tax and franchise charge; vehicle ownership tax; yearly income tax; property tax spent on human and health services, economic development, retirement benefits, enterprises, authorities, courts, jails, libraries, schools, elections and district attorney, assessor, financial, and legal offices combined; income or property tax equal to the combined yearly cost of lease purchases, unbonded obligations not paid or offset by a pledged cash reserve in the year created, tax-increment financing, tax and spending and future local debt increases approved by voters after 1992 that last more than 10 years after approval, excess revenue for more than one year per election, revenue increases voter-approved after 2000 above a fixed tax rate and a fixed maximum number of dollars yearly, and tax credits and rebates unless voter-approved, for overpayment, or for general refunds of excess or illegal revenue; income or property tax equal to the prior year's revenue above ninety-nine percent of its spending limits; income or property tax equal to yearly revenue from a tax rate increased or a spending limit percentage, computed since 1992, exceeded from 1993 through 2000, except by a fixed tax rate and a voter-approved fixed maximum number of dollars yearly; income or property tax equal to the yearly revenue of each authority wholly or partly created by or related to the district but outside fiscal year spending limits, computed since 1992, and the yearly cost of all state and local tax and business charge exemptions related to each authority and enterprise; and remaining business personal property tax. The initial tax cut of $30 is applied to tax bills for tax year 2001.

The measure specifies that it does not require any specific ballot issue title or content, does not impair binding contracts or debts existing in 2000, and does not increase state or local tax or spending limits. The state is required to replace the local government revenue affected by the tax cuts established by this measure when the state has a fiscal year revenue increase from all sources of $200 million or more above that year's increase in the amount of local revenue to be replaced. The state is required to audit each tax and spending limit yearly. The measure provides that it is to be strictly construed and not balanced or harmonized with existing provisions. Substantial compliance with the measure is not sufficient. All attorney fees and costs are always awarded to successful plaintiffs only who seek to enforce this new measure.

*State impacts.* The state income tax cut would reduce the growth in state general fund revenue by $304,390,000 during the three-year period beginning with fiscal year 2001–02. The cut in the state utility customer tax and other income tax cuts contained in the measure would reduce the growth in state general fund revenue by an indetermi-

nate amount during the same three-year period.

The state would incur costs of at least $1,100,000 to administer the tax cuts allowed by this measure. In addition, the state may incur costs for possible annual audits, but the amount of these additional costs is indeterminate.

If the state replaces local government revenue losses resulting from the measure, the measure would have a significant but indeterminate negative fiscal impact on the state. Assuming no state replacement of local revenue, the measure would have a net negative state fiscal impact of at least $305,490,000 during the three-year period beginning with fiscal year 2001–02. The figure does not include the amount of negative fiscal impact that will occur but is indeterminate at this time.

*Local impacts.* If the state does not replace local government revenue lost due to the measure, the measure would have a significant negative fiscal impact on local governments. Even if the state replaces lost local government revenues, the measure may have a negative fiscal impact on some local governments, since the measure does not increase local tax and spending limits and revenues are currently being collected outside those limits. This measure may increase local government costs due to possible accounting and audit costs, attorney fees and costs that must be mandatorily awarded, and possible increased litigation. The amount of these additional local costs is indeterminate.

September 16, 1998

Hearing adjourned 4:38 p.m.

Rehearing, October 7, 1998

John S. Outcelt Motion for Rehearing

Granted as to paragraph 8 of the Motion, otherwise denied in part.

Hearing adjourned 2:50 p.m.

12. Amend TABOR.

PROPOSED INITIATIVE NUMBER
"1999–2000 # 27" [12]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION ESTABLISHING A $25 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $25 THE NEXT YEAR, AND $50 YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION ESTABLISHING A $25 TAX CUT TO LOWER EACH 2001 STATE AND LOCAL TAX BILL FOR EACH UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, AND SPECIFIED INCOME TAX AND PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT $25 THE NEXT YEAR, AND $50

YEARLY THEREAFTER; REQUIRING STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WHEN YEARLY STATE REVENUE INCREASES $200 MILLION OR MORE ABOVE THAT YEAR'S INCREASE IN LOCAL REVENUE REPLACEMENT; REQUIRING YEARLY STATE AUDITS OF TAX AND SPENDING LIMITS; SPECIFYING RULES FOR CONSTRUING THIS AMENDMENT; STATING THAT THIS AMENDMENT DOES NOT REQUIRE ANY SPECIFIC BALLOT ISSUE TITLE, DOES NOT IMPAIR BINDING CONTRACTS OR DEBTS EXISTING IN 2000, AND DOES NOT INCREASE STATE OR LOCAL TAX OR SPENDING LIMITS; AND AWARDING MANDATORY ATTORNEY FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY?

The summary prepared by the Board is as follows:

This measure amends article X, section 20 of the Colorado Constitution, by adding a new paragraph (d) to subsection (8). A $25 tax cut, increased $25 the next year and $50 each year thereafter, would lower each state and local tax bill for each utility customer tax and franchise charge; vehicle ownership tax; yearly income tax; property tax spent on human and health services, economic development, retirement benefits, enterprises, authorities, courts, jails, libraries, schools, elections, and district attorney, assessor, financial, and legal offices combined; income or property tax equal to the combined yearly cost of lease purchases, unbonded obligations not paid and not offset by a pledged cash reserve in the year created, tax-increment financing, tax and spending and future local debt increases approved by voters after 1992 that last more than 10 years after approval, excess revenue for more than one year per election, revenue increases voter-approved after 2000 above a fixed tax rate and a fixed maximum number of dollars yearly, and tax credits and rebates unless voter-approved, for overpayment, or for general refunds of excess or illegal revenue; income or property tax equal to the prior year's revenue above ninety-nine percent of its spending limits; income or property tax equal to yearly revenue from a tax rate increased or a spending limit percentage, computed since 1992, exceeded from 1993 through 2000, except by a fixed tax rate and a voter-approved fixed maximum number of dollars yearly; income or property tax equal to the yearly revenue of each authority wholly or partly created by or related to the district but outside fiscal year spending limits, computed since 1992, and the yearly cost of all state and local tax and business charge exemptions related to each authority and enterprise; and remaining business personal property tax. The initial tax cut of $25 is applied to tax bills for tax year 2001.

The measure specifies that it does not require any specific ballot issue title or content, does not impair binding contracts or debts existing in 2000, and does not increase state or local tax or spending limits. The state is required to replace the local government revenue affected by the tax cuts established by this measure when the state has a fiscal year revenue increase from all sources of $200 million or more above that year's increase in the amount of local revenue to be replaced. The state is required to audit each tax and spending limit yearly. The measure provides that it is to be strictly construed and not balanced or harmonized with existing provisions. Substantial compliance with the measure is not sufficient. All attorney fees and costs are always awarded to successful plaintiffs only who seek to enforce this new measure.

*State impacts.* The state income tax cut would reduce the growth in state general fund revenue by $291,930,000 during the three-year period beginning with fiscal year 2001–02. The cut in the state utility customer tax and other income tax cuts contained in the measure would reduce the growth in state general fund revenue by an indeterminate amount during the same three-year period.

The state would incur costs of at least $1,100,000 to administer the tax cuts allowed by this measure. In addition, the state may incur costs for possible annual audits, but the amount of these additional costs is indeterminate.

Assuming the state's revenue growth is sufficient to require state replacement of local government revenue losses resulting from the measure, the measure would have a significant but indeterminate negative fiscal impact on the state. Assuming no state replacement of local revenue, the measure would have a net negative state fiscal impact of at least $293,030,000 during the three-year period beginning with fiscal year 2001–02. The figure does not include the amount of negative fiscal impact that will occur but is indeterminate at this time.

*Local impacts.* If the state's revenue growth is not sufficient to require state replacement of local government revenue lost due to the measure, the measure would have a significant negative fiscal impact on local governments. Even if the state replaces lost local government revenues, the measure may have a negative fiscal impact on some local governments, since the measure does not increase local tax and spending limits and revenues are currently being collected outside those limits. This measure may increase local government costs due to possible accounting and audit costs, attorney fees and costs that must be mandatorily awarded, and possible increased litigation. The amount of these additional local costs is indeterminate.

October 7, 1998

Hearing adjourned 3:15 p.m.

Rehearing, October 21, 1998

John S. Outcelt, Motion for Rehearing denied

Hearing adjourned 2:11 p.m.