2013 CO 1

In the Matter of the Title, Ballot Title and Submission Clause for Proposed Initiatives 2011–2012 Nos. 67, 68, and 69.

Philip HAYES, Petitioner

v.

David OTTKE and John Slota, Respondents

and

Suzanne Staiert, Daniel Domenico, and Sharon Eubanks, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause for Proposed Initiatives 2011–2012 Nos. 94 and 95.

Barbara M.A. Walker and Don Childears, Petitioners

v.

Earl Staelin and Robert Bows, Respondents

and

Suzanne Staiert, Daniel Domenico, and Jason Gelander, Title Board.

Nos. 12SA117, 12SA130.

Supreme Court of Colorado, En Banc.

Jan. 7, 2013.

Heizer Paul Grueskin LLP, Mark G. Grueskin, Denver, Colorado, Attorneys for Petitioner Hayes.

Rothgerber Johnson & Lyons LLP, Thomas M. Rogers III, Nathaniel S. Barker, Denver, Colorado, Attorneys for Petitioner Walker.

Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Michael D. Hoke, Denver, Colorado, Attorneys for Petitioner Childears.

Jessica K. Peck, Attorney at Law, LLC, Jessica K. Peck, Denver, Colorado, Attorneys for Respondents Ottke and Slota.

Onsager, Staelin, & Guyerson, LLC, Earl H. Staelin, Denver, Colorado, Attorneys for Respondents Staelin and Bows.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, Colorado, Attorney for Title Board.

Brownstein, Hyatt, Farber, Schreck, LLP, Michael D. Hoke, Jason R. Dunn, Denver, Colorado, Attorneys for Amicus Curiae Action 22, Associated General Contractors—Colorado, Aurora Chamber of Commerce, Castle Rock Economic Development Council, Club 20, Colorado Association of Commerce and Industry, Colorado Association of Mechanical and Plumbing Contractors, Colorado Association of School Boards, Colorado Bioscience Association, Colorado Children's Campaign, Colorado Competitive Council (C3), Colorado Concern, Colorado Contractors Association, Colorado Education Association, Colorado Hotel and Lodging Association, Colorado Oil and Gas Association, Colorado Restaurant Association, Colorado's Future, Denver Metro Chamber of Commerce, Denver South Economic Development Partnership, Economic Development Council of Colorado, Grand Junction Area Chamber of Commerce, NAIOP Colorado, Pipefitters Local Union # 208, Progressive 15, Pueblo Chamber of Commerce, The Convention and Visitors Bureau and Visit Denver.

Justice MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In this opinion, we review the actions of the title setting board ("Title Board") in setting the titles and ballot titles and submission clauses (collectively, "titles") in two groups of initiatives. These original proceedings are brought by registered electors of the State of Colorado pursuant to section 1–40–107(2), C.R.S. (2012).

¶ 2 In Case No. 12SA117, Petitioner Philip Hayes challenges the Title Board's actions in setting titles for Initiatives 2011–2012 Nos. 67, 68, and 69 (unofficially captioned the "Citizen Initiative Process" by legislative staff for tracking purposes). Respondents David Ottke and John Slota are the designated representatives for these proposed initiatives. If adopted by voters, these initiatives would alter the way the General Assembly may amend or repeal citizen-initiated statutes. Initiatives No. 68 and No. 69 would also reduce the number of signatures required to propose an initiated statute.[1]

¶ 3 In Case No. 12SA130,[2] Petitioners Barbara Walker and Don Childears challenge the Title Board's actions in setting titles for Initiative 2011–2012 No. 94 (unofficially captioned "Establishment of Banks Owned by Political Subdivisions" by legislative staff for tracking purposes) and No. 95 (unofficially captioned "Establish a State–Owned Bank" by legislative staff for tracking purposes) (collectively, the "Banking Initiatives"). Respondents Earl Staelin and Robert Bows are the designated representatives for these proposed initiatives. If adopted by voters, Initiative No. 94 would amend the state constitution to allow political subdivisions of the state to establish and operate banks, and Initiative No. 95 would amend the constitution to establish a bank owned and operated by the State of Colorado. These initiatives also set forth provisions concerning the regu-

---

1. The titles and text of Initiatives 2011–2012 Nos. 67, 68, and 69 are attached as Appendix A.

2. Petitioner Walker filed two petitions: one in Case No. 12SA130, challenging Initiative 2011–2012 No. 95, and the other in Case No. 12SA131,

challenging Initiative 2011–2012 No. 94. In Case No. 12SA132, Petitioner Childears filed a single petition challenging both Initiatives No. 94 and No. 95. Case Nos. 12SA131 and 12SA132 were consolidated with 12SA130.

lation, governance, and capitalization requirements of such government-owned banks.[3]

¶ 4 Petitioners raise several challenges[4] to the Title Board's actions. However, the common threshold question presented in both 12SA117 and 12SA130 is whether the Title Board had authority to act on motions for rehearing to address challenges to the titles previously set, where fewer than both of the designated representatives of the initiative's proponents appeared at the rehearing.

¶ 5 Because section 1–40–106(4)(a), C.R.S. (2012), requires "[e]ach designated representative" to appear at "any title board meeting at which the designated representative's ballot issue is considered," and because a rehearing qualifies as a "meeting" of the Title Board under sections 1–40–106(1) and 1–40–107(1)(c), C.R.S. (2012), we hold that these provisions require both designated representatives to appear at a rehearing on challenges to a previous decision or title set by the Title Board. Further, because section 1–40–106(4)(d), C.R.S. (2012), states that "[t]he title board shall not set a title for a ballot issue if either designated representative of the proponents fails to appear at a title board meeting," and because the title setting process is not complete until the Title Board has resolved a timely motion for rehearing, *see Armstrong v. Davidson*, 10 P.3d 1278, 1282–83 (Colo.2000), we hold that, where, as here, fewer than both designated representatives appear at a rehearing, the Title Board lacks authority to take action with respect to the challenged titles. Rather, under section 1–40–106(4)(d), the Title Board may defer consideration of the challenges raised in the motion for rehearing to the Title Board's "next meeting," so long as both designated

representatives appear at that meeting. Accordingly, we reverse the actions of the Title Board with respect to the initiatives at issue here, and return the measures to the Title Board for further proceedings consistent with this opinion.

## I. Relevant Procedural Background

### A. 12SA117, Initiatives 2011–2012 Nos. 67, 68, and 69 (the "Citizen Initiative Process" Initiatives)

¶ 6 On April 4, 2012, the Title Board held a public meeting to set the titles and submission clauses for Initiatives 2011–2012 Nos. 67, 68, and 69. Thereafter, Petitioner Hayes filed a timely motion for rehearing. On April 11, 2012, an employee from the Elections Division at the Secretary of State's office sent an email to Mr. Ottke and Mr. Slota, the designated representatives for the initiatives, informing them that a motion for rehearing had been filed, and that "[p]ursuant to section 1–40–106(4)(a), C.R.S., both designated representatives will need to appear at the rehearing." The following day, however, the same employee sent Mr. Ottke and Mr. Slota another email, stating that they were not required to appear at the hearing, and apologizing for giving incorrect information in the previous email.

¶ 7 Only Mr. Ottke attended the rehearing before the Title Board on April 19, 2012. At the beginning of the rehearing, counsel for Petitioner Hayes argued that section 1–40–106(4)(a) required both representatives to participate, and that because only one was present, the Board should deem the motion for rehearing admitted. The Board rejected that argument by a two-to-one vote. The

---

3. The titles and text of Initiatives 2011–2012 Nos. 94 and 95 are attached as Appendix B.

4. Petitioners in both 12SA117 and 12SA130 also claim that the titles set by the Title Board for each initiative violate the single-subject and clear-title requirements of article V, section 1(5.5) of the Colorado Constitution and section 1–40–106.5, C.R.S. (2012). Petitioners in 12SA130 also challenge the Title Board's authority to set title on the grounds that (1) the proponents made substantive changes to the underlying measures that were not in direct response to questions or comments posed at the review and

comment hearing before the legislative council, in violation of section 1–40–105(2), C.R.S. (2012); and (2) the measures fail to comply with article V, section 1(8) of the Colorado Constitution and section 1–40–105(4), C.R.S. (2012), because both Initiative No. 94 and No. 95 contain extensive prefatory language above the "Be it Enacted" clause. Because we reverse the action of the Title Board on the ground that it lacked authority to act on the challenges to the titles where fewer than both designated representatives appeared at the rehearing, we do not reach Petitioners' additional arguments.

Title Board proceeded to amend the language of the titles in response to other arguments raised in the motion for rehearing not relevant here, and denied the motion in all other respects.

### B. 12SA130, Initiatives 2011–2012 Nos. 94 and 95 (the "Banking Initiatives")

¶ 8 On April 18, 2012, at the last regularly scheduled meeting of the Title Board in the 2012 election cycle, the Board set titles and submission clauses for Initiatives 2011–2012 Nos. 94 and 95. At the conclusion of that meeting, a member of the Title Board informed everyone present that any motion for rehearing must be filed within seven days and that, because the titles had been set at the Board's last meeting in April, any motion for rehearing would be heard within forty-eight hours after the expiration of the seven-day filing period for such motions. *See* § 1–40–107(1)(a), (c), C.R.S. (2012).

¶ 9 Petitioners Childears and Walker thereafter filed timely motions for rehearing. On April 26, 2012, the Title Board held the rehearing. Of the two designated representatives, Mr. Bows did not attend the rehearing meeting at all, and although Mr. Staelin attended a portion of the meeting regarding Initiative 2011–2012 No. 94, he was absent during the entire discussion regarding Initiative 2011–2012 No. 95.

¶ 10 At the beginning of the rehearing, counsel for Petitioner Childears argued that section 1–40–106(4)(a) required both designated representatives be present, and that under section 1–40–106(4)(d), the Title Board lacked authority to set a title if either designated representative failed to appear. On a two-to-one vote, the Board rejected Petitioner's argument, concluding that it had already set title for the initiatives at the April 18, 2012 meeting, and that the applicable statutes did not provide a remedy for the designated representatives' failure to attend the rehearing. After rejecting Petitioner's single-subject and clear-title challenges, the Title Board amended the language for the titles of both initiatives and voted to deny the motions for rehearing.

## II. Analysis

### A. Standard of Review

¶ 11 The Title Board has considerable discretion in setting the title, ballot title and submission clause, and summary for a ballot initiative. *In re Proposed Initiative on Parental Choice in Educ.,* 917 P.2d 292, 294 (Colo.1996). Thus, in reviewing the actions of the Board, we generally defer to its broad discretion in the exercise of its drafting authority, *see In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127, 1131 (Colo.1996), and "we employ all legitimate presumptions in favor of the propriety of the Board's actions." *In re Title, Ballot Title Submission Clause for 2009–2010 No. 45,* 234 P.3d 642, 645 (Colo.2010).

¶ 12 The issue here, however, concerns the Title Board's statutory authority to act in the first instance, not whether it abused its discretion in exercising that authority. We review the statutes governing the Board's authority to act de novo. *See Sperry v. Field,* 205 P.3d 365, 367 (Colo.2009) ("Statutory interpretation is a question of law subject to de novo review."). Our goal in construing a statute is to ascertain and give effect to the General Assembly's intent. *Byrne v. Title Board,* 907 P.2d 570, 573 n. 2 (Colo.1995). We first look to the statutory language in question. *Id.* Where that language is clear and unambiguous, we give effect to the plain and ordinary meaning of the statute, without resorting to other rules of statutory construction. *Id.*

### B. Constitutional and Statutory Framework

¶ 13 We briefly review the purpose of the constitutional single-subject and clear-title requirements and implementing legislation to provide context for our analysis. Article V, section 1(5.5) of the Colorado Constitution requires that "[n]o measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title." *See also* § 1–40–106.5(1)(a), C.R.S. (2012) (requiring "every constitutional amendment or law proposed by initiative and every constitutional amendment proposed by the general assembly be limited to a single-

subject, which shall be clearly expressed in its title"). The single-subject and corresponding clear-title requirements are derived from similar constitutional requirements that apply to bills proposed by the General Assembly. *See In re Title, Ballot Title and Submission Clause, and Summary for 1999–2000 No. 25*, 974 P.2d 458, 460–65 (Colo.1999) (discussing history of single-subject and clear-title requirements); § 1–40–106.5(1)(c), C.R.S. (2012). In the initiative context, these requirements are intended to prevent voters from being confused or misled, and to ensure that each proposal depends upon its own merits for passage. See § 1–40–106.5(1)(e), C.R.S. (2012); *In the Matter of Title, Ballot Title and Submission Clause, for 1997–1998 No. 74*, 962 P.2d 927, 928 (Colo.1998); *In re Proposed Initiative "Public Rights in Waters II"*, 898 P.2d 1076, 1078 (Colo.1995).

¶ 14 The General Assembly has vested the Title Board with responsibility for carrying out these constitutional mandates. §§ 1–40–106, 1–40–106.5(3), C.R.S. (2012); *In re Title, Ballot Title and Submission Clause, and Summary for 1999–2000 No. 25*, 974 P.2d at 465. Specifically, the Title Board's duty is to "consider the public confusion that might be caused by misleading titles" and to "avoid titles for which the general understanding of the effect of a 'yes' or 'no' vote will be unclear." § 1–40–106(3)(b), C.R.S. (2012).[5] The Title Board must set titles that "correctly and fairly express the true intent and meaning" of the proposed initiative, and ballot titles "shall unambiguously state the principle of the provision sought to be added, amended, or repealed." *Id.*

■ ¶ 15 We have recognized that the Board has the often difficult task of balancing the competing interests of the proponents of the proposed initiative against concerns raised by its opponents and other members of the public:

> For example, the Board must assist potential proponents in implementing their right to initiate laws while concurrently protecting the voters against confusion and fraud.

Likewise, the Board must give deference to the intent of the proposal as expressed by its proponent without neglecting its duty to consider the public confusion that might result from misleading titles.

*In re Title, Ballot Title and Submission Clause, and Summary for 1999–2000 No. 25*, 974 P.2d at 465 (internal citations omitted). Given this difficult task, the Title Board considers proposed initiatives at public meetings to set a title and ballot title and submission clause for each draft proposed initiative submitted to the Secretary of State. *See* § 1–40–106(1). If a timely motion for rehearing is filed challenging a Title Board decision or title set, the Board meets again to consider such motions. § 1–40–107(1), C.R.S. (2012). These public meetings are the Title Board's opportunity to engage both proponents and opponents of an initiative in discussion regarding the intent and purpose of the proposed measure as the Board carries out its title setting duties. Such meetings are a critical part of the title setting process because "if the Board cannot comprehend a proposed initiative sufficiently to state its single-subject clearly in the title, it necessarily follows that the initiative cannot be forwarded to the voters." *In re Title, Ballot Title & Submission Clause, & Summary for 1999–2000 No. 25*, 974 P.2d at 465.

¶ 16 With this constitutional and statutory framework in mind, we turn to the issues raised in these proceedings.

## C. Discussion

■ ¶ 17 In 2011, the General Assembly enacted House Bill 11–1072, an act "Concerning the Responsibilities of a Designated Representative of the Proponents of an Initiative Petition." This bill included amendments to section 1–40–106, which governs the procedures to be followed at Title Board meetings. Ch. 255, sec. 3, 1–40–106, 2011 Colo. Sess. Laws 1102, 1102–04.

¶ 18 Relevant here, House Bill 11–1072 added subsection (4) to section 1–40–106, and amended section 1–40–106(1) to provide that

---

5. The version of section 1–40–106(3)(b) quoted was amended effective January 1, 2013. The amendments do not affect the Title Board's role, the purpose of the title-setting provisions, or our analysis of the Title Board's authority to set title in these proceedings. Ch. 70, secs. 2, 5, 1–40–106(3)(b), 2012 Colo. Sess. Laws 241, 241–43.

for an initiative to be considered at a public meeting of the Title Board, the "designated representatives of the proponents must comply with the requirements of subsection (4) of this section." Subsection (4)(a) requires that "[e]ach designated representative of the proponents shall appear at any title board meeting at which the designated representative's ballot issue is considered." § 1–40–106(4)(a). Subsection (4)(d) provides that "[t]he title board shall not set a title for a ballot issue if either designated representative of the proponents fails to appear at a title board meeting." § 1–40–106(4)(d). In that event, the Title Board "may consider the ballot issue at its next meeting, but the requirements of this subsection (4) shall continue to apply." *Id.*

¶ 19 We agree with Petitioners that the language of subsection (4)(a) reflects the legislature's clear and unambiguous intent to require both designated representatives to appear at all Title Board meetings at which the representatives' proposed initiative is considered, including any rehearing.

¶ 20 First, "each" is "[a] distributive adjective pronoun, which denotes or refers to every one of the persons or things mentioned; every one of two or more persons or things, composing the whole, separately considered." Black's Law Dictionary 507 (6th ed. 1991); *see also* Webster's Third New International Dictionary 713 (1986) (defining "each" as "each one" and "every one of two or more distinct individuals having a similar relation and often constituting an aggregate"). Had the General Assembly intended to require that only one of the two designated representatives attend Title Board meetings, it could have used the phrase "a designated representative" or "at least one of the designated representatives" instead of "each designated representative."

¶ 21 Next, section 1–40–106(1)(a) makes clear that the phrase "any title board meeting at which the designated representative's ballot issue is considered" in section 1–4–106(4)(a) includes rehearings:

> The title board, by majority vote, shall proceed to designate and fix a proper fair title for each proposed law or constitutional amendment, together with a submission clause, at public meetings ... on the first and third Wednesdays of each month in which a draft or a motion for reconsideration has been submitted to the secretary of state.

This provision specifically identifies both a "draft" initiative and "a motion for reconsideration" as filings considered at Title Board "meetings." Moreover, section 1–40–107, which governs motions for rehearing, provides that a timely filed "motion for rehearing shall be heard at the next regularly scheduled meeting of the title board." § 1–40–107(1)(c). Thus, at least in this context, there is no distinction between Title Board "meetings" and "hearings." *See, e.g., In re Title, Ballot Title, Submission Clause for 2011–2012 No. 45,* 2012 CO 26, ¶ 5, 274 P.3d 576, 579 (referring to the proceeding at which the Board heard testimony, discussed, and ruled on objections raised in a motion for rehearing as a "meeting"); *In re Title, Ballot Title and Submission Clause, for 2007–2008, No. 17,* 172 P.3d 871, 873 (Colo.2007) (referring both to the proceedings at which the Board considered the initial draft of the proposed initiative and the motion for rehearing as "meetings"); *Byrne,* 907 P.2d at 572, 575–76 (referring to Title Board proceeding on motion for rehearing as both a hearing and a meeting).

¶ 22 In sum, section 1–40–106(4)(a)'s requirement that both designated representatives attend all meetings at which the Board considers their proposed initiatives, including meetings to consider motions for rehearing, is both unambiguous and inflexible. This requirement furthers the information-gathering purpose of the Title Board's public meetings and facilitates its ability to fully understand the intent and purpose of the proposed initiatives considered at such meetings by requiring the designated representatives to be available to explain the measures and answer the Board's questions.

¶ 23 The question then becomes what consequence follows from the designated representatives' failure to appear at a Title Board meeting, in violation of section 1–40–106(4)(a). Section 1–40–106(4)(d) provides that the Title Board "shall not set a title for a ballot issue if either designated representative of the proponents fails to appear at a

title board meeting," and that the "title board may consider the ballot issue at its next meeting, but the requirements of subsection (4) shall continue to apply." Under the plain language of this provision, the Board is deprived of the authority to set a title when either of the designated representatives fails to appear at a Title Board meeting.

¶ 24 That the Board initially sets title when it meets to consider a draft initiative does not mean that section 1–40–106(4)(d) applies only to the Board's authority to act at that initial meeting. The title setting process is not complete until the Title Board has ruled on any motions for rehearing, or the time for filing a motion for rehearing has expired. *See Armstrong,* 10 P.3d at 1282–83; *see also* § 1–40–107(4) ("No petition for any initiative measure shall be circulated nor any signature thereto have any force or effect which has been signed before the titles and submission clause have been fixed and determined as provided in section 1–40–106 and this section.").

¶ 25 Contrary to Respondents' suggestion, the rehearing is not simply a "procedural" hearing. Indeed, through objections raised by opponents, the Title Board's meeting on a motion for rehearing may be the only stage in the title setting process at which a detailed discussion occurs regarding whether the measure contains a single-subject, whether proponents made substantive changes after the review and comment hearing beyond those in direct response to questions or comments by the legislative council, and whether the title as initially adopted is clear and best reflects the true import of the measure. The rehearing is therefore an important part of the statutory scheme designed to implement the constitutional single-subject and clear-title requirements.

¶ 26 The importance of the rehearing meeting in achieving that goal is illustrated by the discussions that occurred during the Title Board meeting on the motions for rehearing filed with respect to Initiatives 2011–2012 Nos. 94 and 95. Petitioners argued that the proponents of the measures had made changes to both initiatives after the review and comment hearing that were substantive and not in direct response to questions or comments posed by the legislative council at that hearing. During the colloquy regarding Initiative 2011–2012 No. 94, a Board member asked Mr. Staelin, the one designated representative who was present at the meeting, whether a particular change was made in response to a question at the review and comment hearing. Mr. Staelin responded, "You know, frankly, I don't think I can answer that." During the Board's discussion of Initiative 2011–2012 No. 95, neither designated representative was present. This proved problematic, because the Board was left to speculate about whether changes the proponents made to that initiative were responsive to comments made at the review and comment hearing. In the absence of the designated representatives, the Board was left to rely on the statements of an objector whose counsel had listened to the review and comment hearing, and the directly contradictory comments of one Title Board member who apparently had spoken with the staff person conducting that review and comment hearing.

¶ 27 We recognize that we have previously held that the failure of proponents to comply with the requirement to designate two representatives does not affect the Board's authority to act, because it is simply "a procedural requirement promoting efficient notification." *In re Proposed Initiated Constitutional Amendment Concerning Ltd. Gaming in City of Antonito,* 873 P.2d 733, 739 (Colo. 1994) (holding that proponents' designation of only one person to whom all notices or information would be mailed instead of two did not deprive Title Board of authority to fix the title); *In re Initiative Concerning "Taxation III",* 832 P.2d 937, 942 (Colo.1992) (holding that listing of five proponents, where the statute required that the proponents designate two persons to whom all notices or information concerning the petition would be mailed, did not affect the Board's authority to act).

¶ 28 However, the General Assembly's subsequent enactment of House Bill 11–1072 substantively expanded the role of a designated representative from being merely a person to whom notices were sent, to now

serving as the representative of the proponents "in all matters affecting the petition," including functioning as the proponents' spokesperson at Title Board meetings. § 1–40–104; *see also* § 1–40–102(3.7), C.R.S. (2012) (defining "designated representative" as "a person designated pursuant to section 1–40–104 to represent the proponents in all matters affecting the petition"). Given the new requirement in section 1–40–106(4)(a) that both designated representatives attend all Title Board meetings, and the provision in section 1–40–106(4)(d) depriving the Board of authority to act when either representative fails to do so, it is clear that the current statutory requirements concerning designated representatives are no longer merely procedural requirements "promoting efficient notification," but are instead substantive requirements designed to promote the purpose of the title setting process by ensuring that the Board has access to the information it needs to resolve the substantive issues raised at any meeting concerning a proposed initiative.

¶ 29 Finally, section 1–40–106(4)(d) provides that when a designated representative's failure to attend a meeting deprives the Board of authority to act, the Board "may consider the ballot issue at its next meeting, but the requirements of this subsection (4) shall continue to apply." The fact that the rehearing meetings in these cases were conducted at or after the Board's last regularly scheduled meeting for the 2011–2012 election cycle was consistent with the timeframes established in section 1–40–107(c); that the time constraints of the election cycle meant that the Board was unable to set titles for those initiatives in time for the 2012 election did not justify its decision to set titles when the statute deprived it of authority to do so.

¶ 30 We are unpersuaded by Respondents' contentions that enforcing the statutory attendance requirement would be unfair because they did not have notice that they would be required to attend any rehearing meetings. Section 1–40–106(4)(b) requires each designated representative to "certify by a notarized affidavit" that he or she "is familiar with the provisions of this article," and that the affidavits be filed with the Secretary

of State "at the first title board meeting at which the designated representative's ballot issue is considered." We presume that both designated representatives for each of the proposed initiatives at issue here complied with this statutory mandate. In so doing, they certified that they were aware not only that they were required to attend all meetings at which their proposed initiatives would be considered, but also that any motion for rehearing would be heard at the Board's next meeting or within forty-eight hours after the expiration of the seven-day deadline for filing such motions. *See* § 1–40–107(1)(a). The email to Mr. Ottke and Mr. Slota from the Secretary of State's office suggesting that they were not required to attend the meeting on the motion for rehearing did not relieve them of their clear statutory obligation to do so. *Cf. Comm. for Better Health Care v. Meyer*, 830 P.2d 884, 892 (Colo.1992) (holding that where initiative proponents were provided with copies of relevant statutory amendments and related documents, proponents did not reasonably rely on statements by the Secretary of State to assume that amendments did not apply to their initiative).

### III. Conclusion

¶ 31 Because the Title Board lacked authority to set titles for these measures, we reverse the action of the Board. In light of our holding, we do not consider the parties' remaining contentions and instead return both matters to the Board for further proceedings consistent with this opinion.

### APPENDIX A

**Proposed Initiative 2011–2012 No. 67**

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any statute enacted by citizen initiative, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any statute enacted by citizen initiative, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters?

The text of Proposed Initiative 2011–2012 No. 67 is as follows:

Be it Enacted by the People of the State of Colorado:

In the constitution of the state of Colorado, section I of article. V, add (11), and amend section 22 of article V, as follows:

"**Section 1. General assembly—initiative and referendum.** (11)(a) THIS MEASURE SHALL BE KNOWN AND MAY BE CITED AS THE "YOUR VOTE COUNTS ACT."

(b) A STATUTE ENACTED BY CITIZEN INITIATIVE PURSUANT TO THIS ARTICLE SHALL NOT BE REPEALED OR AMENDED BY THE GENERAL ASSEMBLY EXCEPT BY AT LEAST A THREE–FOURTHS VOTE OF THE MEMBERS OF EACH HOUSE, UNLESS SUCH STATUTE EXPLICITLY PROVIDES THAT THE GENERAL ASSEMBLY MAY REPEAL OR AMEND THE STATUTE OR SPECIFIC PARTS OF THE STATUTE BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE.

(c) THE GENERAL ASSEMBLY MAY BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE PLACE A REPEAL OF A STATUTE ENACTED BY CITIZEN INITIATIVE OR AN AMENDMENT OR AMENDMENTS TO SUCH A STATUTE ON THE BALLOT FOR A VOTE OF THE PEOPLE THROUGH A STATEWIDE REFERENDUM. IF A MAJORITY OF VOTERS CASTING BALLOTS ON THE SPECIFIC REFERENDUM VOTE IN FAVOR, THE REPEAL, AMENDMENT OR AMENDMENTS SHALL BE ENACTED.

(d) THIS SUBSECTION (11) SHALL APPLY PROSPECTIVELY TO ACTIONS OF THE GENERAL ASSEMBLY RELATING TO STATUTES ENACTED BY CITIZEN INITIATIVE PURSUANT TO THIS ARTICLE, WHETHER THE INITIATIVE STATUTE WAS ENACTED BEFORE OR IS ENACTED AFTER THE EFFECTIVE DATE OF THIS SECTION.

"**Section 22. Reading and Passage of Bills.** Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present. All substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of the majority of all members elected to each house taken on two separate days in each house, EXCEPT AS SET FORTH IN SECTION 1(11) OF ARTICLE V OF THIS CONSTITUTION, nor unless upon its final passage the vote be taken by ayes and noes and the names of those voting be entered on the journal.

**Proposed Initiative 2011–2012 No. 68**

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning statutes enacted by citizen initiative, and, in connection therewith, reducing the minimum number of signatures required to propose an initiated statute from 5% to 4% of the votes cast in the previous election for secretary of state; and requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any initiated statute, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning statutes enacted by citizen initiative, and, in connection therewith, reducing the minimum number of signatures required to propose an initiated statute from 5% to 4% of the votes cast in the previous election for secretary of state; and requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any initiated statute, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters?

The text of Proposed Initiative 2011–2012 No. 68 is as follows:

Be it Enacted by the People of the State of Colorado:

In the constitution of the state of Colorado, section 1 of article V, amend (2); add (11), and amend section 22 of article V, as follows:

"**Section 1, General assembly—initiative and referendum.** (2) The first power hereby reserved by the people is the initiative, and signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to propose ~~any measure~~ A CONSTITUTIONAL AMENDMENT by petition AND AT LEAST FOUR PERCENT TO PROPOSE LEGISLATION BY PETITION, and every such petition shall include the full text of the measure so proposed. Initiative petitions for state legislation and amendments to the constitution, in such form as may be prescribed pursuant to law, shall be addressed to and filed with the secretary of state at least three months before the general election at which they are to be voted upon.

(11) (a) THIS MEASURE SHALL BE KNOWN AND MAY BE CITED AS THE "YOUR VOTE COUNTS ACT."

(b) A STATUTE ENACTED BY CITIZEN INITIATIVE PURSUANT TO THIS ARTICLE SHALL NOT BE REPEALED OR AMENDED BY THE GENERAL ASSEMBLY EXCEPT BY AT LEAST A THREE–FOURTHS VOTE OF THE MEMBERS OF EACH HOUSE, UNLESS SUCH STATUTE EXPLICITLY PROVIDES THAT THE GENERAL ASSEMBLY MAY REPEAL OR AMEND THE STATUTE OR SPECIFIC PARTS OF THE STATUTE BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE.

(c) THE GENERAL ASSEMBLY MAY BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE PLACE A REPEAL OF A STATUTE ENACTED BY CITIZEN INITIATIVE OR AN AMENDMENT OR AMENDMENTS TO SUCH A STATUTE ON THE BALLOT FOR A VOTE OF THE PEOPLE THROUGH A STATEWIDE REFERENDUM. IF A MAJORITY OF VOTERS CASTING BALLOTS ON THE SPECIFIC REFERENDUM VOTE IN FAVOR, THE REPEAL, AMENDMENT OR AMENDMENTS SHALL BE ENACTED.

(d) THIS SUBSECTION (11) SHALL APPLY PROSPECTIVELY TO ACTIONS OF THE GENERAL ASSEMBLY RELATING TO STATUTES ENACTED BY CITIZEN INITIATIVE PURSUANT TO THIS ARTICLE, WHETHER THE INITIATIVE STATUTE WAS ENACTED BEFORE OR IS ENACTED AFTER THE EFFECTIVE DATE OF THIS SECTION.

"**Section 22. Reading and Passage of Bills.** Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present. All substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of the majority of all members elected to each house taken on two separate days in each house, EXCEPT AS SET FORTH IN SECTION 1(11) OF ARTICLE V OF THIS CONSTITUTION, nor unless upon its final passage the vote be taken by ayes and noes

and the names of those voting be entered on the journal.

**Proposed Initiative 2011–2012 No. 69**

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning statutes enacted by citizen initiative, and, in connection therewith, reducing the minimum number of signatures required to propose an initiated statute from 5% to 3% of the votes cast in the previous election for secretary of state; and requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any initiated statute, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning statutes enacted by citizen initiative, and, in connection therewith, reducing the minimum number of signatures required to propose an initiated statute from 5% to 3% of the votes cast in the previous election for secretary of state; and requiring a vote of at least 3/4ths of the members of each house of the state legislature to amend or repeal any initiated statute, unless the initiated statute includes a provision allowing for its amendment or repeal by a majority vote of the legislature or unless the legislature refers the amendment or repeal of an initiated statute to the voters?

The text of Proposed Initiative 2011–2012 No. 69 is as follows:

Be it Enacted by the People of the State of Colorado:

In the constitution of the state of Colorado, section 1 of article V, amend (2); add (11), and amend section 22 of article V, as follows:

"**Section 1. General assembly—initiative and referendum.** (2) The first power hereby reserved by the people is the initiative, and signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to propose ~~any measure~~ A CONSTITUTIONAL AMENDMENT by petition AND AT LEAST THREE PERCENT TO PROPOSE LEGISLATION BY PETITION, and every such petition shall include the full text of the measure so proposed. Initiative petitions for state legislation and amendments to the constitution, in such form as may be prescribed pursuant to law, shall be addressed to and filed with the secretary of state at least three months before the general election at which they are to be voted upon.

(11) (a) THIS MEASURE SHALL BE KNOWN AND MAY BE CITED AS THE "YOUR VOTE COUNTS ACT."

(b) A STATUTE ENACTED BY CITIZEN INITIATIVE PURSUANT TO THIS ARTICLE SHALL NOT BE REPEALED OR AMENDED BY THE GENERAL ASSEMBLY EXCEPT BY AT LEAST A THREE–FOURTHS VOTE OF THE MEMBERS OF EACH HOUSE; UNLESS SUCH STATUTE EXPLICITLY PROVIDES THAT THE GENERAL ASSEMBLY MAY REPEAL OR AMEND THE STATUTE OR SPECIFIC PARTS OF THE STATUTE BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE.

(c) THE GENERAL ASSEMBLY MAY BY A MAJORITY VOTE OF THE MEMBERS OF EACH HOUSE PLACE A REPEAL OF A STATUTE ENACTED BY CITIZEN INITIATIVE OR AN AMENDMENT OR AMENDMENTS TO SUCH A STATUTE ON THE BALLOT FOR A VOTE OF THE PEOPLE THROUGH A STATEWIDE REFERENDUM. IF A MAJORITY OF VOTERS CASTING BALLOTS ON THE SPECIFIC REFERENDUM VOTE IN FAVOR, THE REPEAL, AMENDMENT OR AMENDMENTS SHALL BE ENACTED.

(d) THIS SUBSECTION (11) SHALL APPLY PROSPECTIVELY TO ACTIONS OF THE GENERAL ASSEMBLY RELATING TO STATUTES ENACTED BY CITI-

ZEN INITIATIVE PURSUANT TO THIS ARTICLE, WHETHER THE INITIATIVE STATUTE WAS ENACTED BEFORE OR IS ENACTED AFTER THE EFFECTIVE DATE Of THIS SECTION.

"**Section 22. Reading and Passage of Bills.** Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present. All substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of the majority of all members elected to each house taken on two separate days in each house, EXCEPT AS SET FORTH IN SECTION 1(11) OF ARTICLE V OF THIS CONSTITUTION, nor unless upon its final passage the vote be taken by ayes and noes and the names of those voting be entered on the journal.

### APPENDIX B

**Proposed Initiative 2011–2012 No. 94**

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado Constitution concerning authorization for political subdivisions of the state to establish and operate banks, and, in connection therewith, allowing political subdivisions to establish and operate banks with the same power and authority of other banks; allowing political subdivisions to deposit all of their revenues, funds, and other assets into such banks and to self-insure deposits with all of their assets; specifying requirements for the governance of such banks, including capitalization requirements; and authorizing the general assembly to provide regulatory guidelines for the oversight of these public banks by the state banking board and the commissioner of financial services.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado Constitution concerning authorization for political subdivisions of the state to establish and operate banks, and, in connection therewith, allowing political subdivisions to establish and operate banks with the same power and authority of other banks; allowing political subdivisions to deposit all of their revenues, funds, and other assets into such banks and to self-insure deposits with all of their assets; specifying requirements for the governance of such banks, including capitalization requirements; and authorizing the general assembly to provide regulatory guidelines for the oversight of these public banks by the state banking board and the commissioner of financial services?

The text of Proposed Initiative 2011–2012 No. 94 is as follows:

Proposed Constitutional Amendment for the State of Colorado To Authorize the Establishment of Banks Owned by Political Subdivisions of the State To Be Numbered as Article X, Section 22

WHEREAS, since 1919 the People of North Dakota have owned and benefited from the successful operation of the Bank of North Dakota, the specific purpose of which has been to provide an in-state repository for the holding, management and distribution of the fees and taxes collected from the operation of the government of North Dakota; and–

WHEREAS, the Bank of North Dakota is limited in its scope and purpose to make funds available for state, city, and county government operations, to benefit the People and communities of North Dakota, and to provide correspondent banking services for chartered members; and

WHEREAS, the People of North Dakota have significantly benefited from the Bank of North Dakota which has paid the state treasurer more than three hundred twenty-five million dollars ($325,000,000) from bank profits over the past ten years; and

WHEREAS, the Bank of North Dakota is attributed with being the cause for the North Dakota economy topping the list of state economies year after year, and with being the only State that has had a continuous budget surplus since before the financial crisis of 2008; and while the rest of America

has been enduring a recession, the state of North Dakota has enjoyed the largest budget surplus in its history; and

WHEREAS, the Bank of North Dakota is attributed with being the cause why in 2011 the People of North Dakota saw almost five hundred million dollars ($500,000,000) returned to them in income and property tax cuts and will enjoy a thirty percent (30%) decrease in tax liability when combining 2009–2011 tax cuts; and

WHEREAS, the Bank of North Dakota is attributed with being the cause why North Dakota has the lowest foreclosure rate, the lowest credit card default rate, and the lowest unemployment rate (3.3%) of any State in the nation; and

WHEREAS, banks in the state of Colorado are failing at a rate five times greater than banks in other parts of the United States; and

WHEREAS, small businesses in the state of Colorado have experienced great difficulties in obtaining necessary capital as a result of the recession that began in 2008 and which result from the monetary policies of the national banking system under the control of the Federal Reserve System; and

WHEREAS, most or all of the above advantages of a State–Owned Bank can also he realized by a city, county, or other political subdivision of the state of Colorado by establishing its own bank modeled on the State Bank of North Dakota;

Be it Enacted by the People of the state of Colorado:

In the constitution of the state of Colorado, add section 22 to article X as follows: 27

(1) *Authorization of Political Subdivisions to Establish Banks.* Any county, municipality, or political subdivision of the state may engage in banking or establish a bank, and may lend money at interest or no interest to promote development and enterprise in the state and to promote any purpose authorized by the laws governing such political subdivision. Any such bank shall have the same powers and authority of other banks chartered by the State of Colorado, as well as the power and authority to deposit public revenues and funds in its own bank, except as expanded or limited by the General Assembly. The revenue, income, and assets of such a bank shall not be limited, nor shall expenditures and management of its revenue, income, and assets be restricted except upon sound financial and public policy considerations. All provisions of this section are self-executing and severable and supersede any conflicting state constitutional, state statutory, state chartered, or other state or local provisions.

(2) **Governance of Banks.**

(a) *Governance of Banks Established by Statutory Municipalities:* In the event a statutory municipality of the state establishes a bank, its board of directors shall consist of the mayor, the municipal attorney, and the chief financial officer of the municipality. The capitalization of such bank may include all revenues, funds, and other assets of the municipality that would normally be deposited or held in a financial institution or designated as collateral by a financial institution.

(b) *Governance of Banks Established by Statutory Counties:* In the event a statutory county of the state establishes a bank, its board of directors shall consist of a county commissioner designated by the county commission, the district attorney, and the chief financial officer of the county. The capitalization of such bank may include all revenues, funds, and other assets of the county that would normally be deposited or held in a financial institution or designated as collateral by a financial institution.

(c) *Governance of Banks Established by Home Rule Municipalities:* In the event a home rule municipality establishes a bank, its board of directors shall consist of at least three elected officials, to consist of the chief executive officer of said municipality (the mayor or equivalent) and two others to be determined by the enabling legislation.

(d) *Governance of Banks Established by Home Rule Counties:* In the event a home rule county establishes a bank, its board of directors shall consist of at least three elected officials, to be determined by the enabling legislation.

(e) *Governance of Banks Established by Political Subdivisions other than Cities and/or Counties:* In the event a political subdivision that is not a municipality or county establishes a bank, its board of directors shall consist of at least three elected officials, to be determined by the enabling legislation.

(f) *Governance of Banks Established by Political Subdivisions that are both a City and a County:* In the event a political subdivision that is both a city and a county establishes a bank, its board of directors shall consist of at least three elected officials, to be determined by the enabling legislation.

(3) *Capitalization of Banks Established by Any Political Subdivision:* Banks established by statutory municipalities, statutory counties, home rule municipalities, home rule counties, political subdivisions of the state other than cities or counties, and political subdivisions that are both a city and a county may be capitalized by the same means available to, and subject to the same minimums prescribed for banks that are privately owned, owned by publicly held corporations, or chartered by this state or the United States. Such means may include bonds, tax revenues, funds, and other assets of the political subdivision that may be so designated for this purpose. Political subdivisions not meeting minimum capitalization requirements may deposit their revenues and funds in banks established by other political subdivisions of the state of Colorado and/or a bank established by the state of Colorado.

(4) *Insured Deposits of Banks Established by Any Political Subdivision:* Banks established by statutory municipalities, statutory counties, home rule municipalities, home rule counties, political subdivisions of the state other than cities or counties, and political subdivisions that are both a city and a county may forego FDIC insurance and self-insure their deposits, the debts and obligations of such banks being backed by the full faith and credit of the political subdivision.

(5) *Regulatory Oversight:* The General Assembly may provide guidelines enforced by the Colorado Banking Board and the Colorado Commissioner of Financial Services for the oversight of banks established by statutory municipalities, statutory counties, home rule municipalities, home rule counties, political subdivisions of the state other than cities or counties, and political subdivisions that are both a city and a county, including auditing requirements.

## Proposed Initiative 2011–2012 No. 95

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning the establishment of a bank owned and operated by the State of Colorado, and, in connection therewith, establishing a bank authorized to lend money for various specified purposes; prohibiting the bank from accepting deposits from any individual or private entity; backing the debts and obligations of the bank by all state assets; authorizing the bank to be capitalized with all state tax and other revenues and funds; specifying requirements for the oversight, governance, and management of the bank; specifying that bank revenue, income, and expenditures shall not be limited or restricted except for financial and public policy considerations; and authorizing the drafting of rules and regulations of the bank subject to approval by the advisory board of the bank, the board of directors of the bank, the Colorado general assembly, and the governor.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning the establishment of a bank owned and operated by the State of Colorado, and, in connection therewith, establishing a bank authorized to lend money for various specified purposes; prohibiting the bank from accepting deposits from any individual or private entity; backing the debts and obligations of the bank by all state assets; authorizing the bank to be capitalized with all state tax and other revenues and funds; specifying requirements for the oversight, governance, and management of the bank; specifying that bank revenue, income, and expenditures shall not be limited or restricted except for financial and public policy

considerations; and authorizing the drafting of rules and regulations of the bank subject to approval by the advisory board of the bank, the board of directors of the bank, the Colorado general assembly, and the governor?

The text of Proposed Initiative 2011–2012 No. 95 is as follows:

Proposed Constitutional Amendment for the State of Colorado To Establish a State–Owned Bank To be Numbered as Article X, Section 23

WHEREAS, since 1919 the People of North Dakota have owned and benefited from the successful operation of the Bank of North Dakota, the specific purpose of which has been to provide an in-state repository for the holding, management, and distribution of the fees and taxes collected from the operation of the government of North Dakota; and

WHEREAS, the Bank of North Dakota is limited in its scope and purpose to: make funds available for state, city, and county government operations, to benefit the People and communities of North Dakota, and to provide correspondent banking services for chartered members; and

WHEREAS, the People of North Dakota have significantly benefited from the Bank of North Dakota which has paid the state treasurer more than three hundred twenty-five ($325,000,000) from bank profits over the past ten years; and

WHEREAS, the Bank of North Dakota is attributed with being the cause for the North Dakota economy topping the list of state economies year after year, and with being the only State that has had a continuous budget surplus since before the financial crisis of 2008; and while the rest of America has been enduring a recession, the state of North Dakota has enjoyed the largest budget surplus in its history; and

WHEREAS, the Bank of North Dakota is attributed with being the cause why in 2011 the People of North Dakota saw almost five hundred million ($500,000,000) returned to them in income and property tax cuts and will enjoy a 30% decrease in lax liability when combining 2009–2011 tax cuts; and

WHEREAS, the Bank of North Dakota is attributed with being the cause why North Dakota has the lowest foreclosure rate, the lowest credit card default rate, and the lowest unemployment rate of any State (3.3%) in the nation; and

WHEREAS, banks in the state of Colorado are failing at a rate five times greater than banks in other parts of the United States; and

WHEREAS, small businesses in the state of Colorado have experienced great difficulties in obtaining necessary capital as a result of the recession that began in 2008 and which result from the monetary policies of the national banking system under the control of the Federal Reserve System; and

WHEREAS, the Bank of North Dakota consolidates the handling of all state funds, while in Colorado various economic development and home ownership programs have limited authority, which may be more efficient if consolidated within one agency;

Be it Enacted by the People of the State of Colorado:

In the constitution of the state of Colorado, add section 23 to Article X as follows:

*(1) ESTABLISHMENT OF STATE–OWNED BANK.* THE STATE OF COLORADO HEREBY ESTABLISHES A BANK TO BE OWNED BY THE STATE OF COLORADO. THE BANK IS AUTHORIZED TO LEND MONEY AT INTEREST OR AT NO INTEREST TO PROMOTE DEVELOPMENT, COMMERCE, INDUSTRY, AND AGRICULTURE IN THE STATE AND TO PROMOTE HOME OWNERSHIP, MAINTENANCE AND CONSTRUCTION OF NEEDED INFRASTRUCTURE, EDUCATION, PUBLIC HEALTH AND SAFETY, AND OTHER PURPOSES FOR THE GENERAL WELFARE OF THE CITIZENS OF THE STATE OF COLORADO. THE BANK SHALL HAVE ALL THE POWERS AND AUTHORITY OF OTHER BANKS CHARTERED BY THE STATE OF COLORADO; EXCEPT THAT THE BANK WILL NOT TAKE DEPOSITS OF INDIVIDUAL CITI-

ZENS, CORPORATIONS, AND OTHER PRIVATE LEGAL ENTITIES. THE DEBTS AND OBLIGATIONS OF THE BANK ARE BACKED BY THE FULL FAITH AND CREDIT OF THE STATE OF COLORADO. THE REVENUE AND INCOME OF SUCH A BANK SHALL NOT BE LIMITED, NOR SHALL EXPENDITURES AND MANAGEMENT OF ITS REVENUE, INCOME, AND ASSETS BE RESTRICTED, EXCEPT UPON SOUND FINANCIAL AND PUBLIC POLICY CONSIDERATIONS. ALL PROVISIONS OF THIS SECTION ARE SELF-EXECUTING AND SEVERABLE AND SUPERSEDE CONFLICTING STATE CONSTITUTIONAL, STATE STATUTORY, STATE CHARTERED, OR OTHER STATE OR LOCAL PROVISIONS.

*(2) GOVERNANCE OF STATE BANK:* THE BOARD OF DIRECTORS OF THE BANK SHALL BE COMPRISED OF THE GOVERNOR, ATTORNEY GENERAL, AND, AUDITOR OF THE STATE, PLUS FOUR OTHERS TO BE CHOSEN BY HOLDERS OF THE OFFICES FIRST MENTIONED ABOVE AND WHO REPRESENT COLORADO'S FINANCIAL, BUSINESS, AGRICULTURE, AND LABOR SECTORS. AT LEAST TWO OF THESE SEVEN MEMBERS MUST HAVE EXECUTIVE EXPERIENCE MANAGING BANKS, THE MAJORITY OF THE STOCK OF WHICH IS OWNED BY RESIDENTS OF THIS STATE. THE TERMS OF THE ADDITIONAL FOUR BOARD MEMBERS SHALL BE SET BY THE GENERAL ASSEMBLY. THE BOARD OF DIRECTORS SHALL RECEIVE INPUT ON THE GENERAL DIRECTION OF THE BANK FROM A NINE-MEMBER BOARD OF ADVISORS WHOSE MEMBERS REPRESENT A BROAD CROSS-SECTION OF THE STATE, INCLUDING BUSINESS AND INDUSTRY, FARMING, TECHNOLOGY, FINANCE, SMALL BUSINESS, EDUCATION, LABOR, AND EMPLOYMENT, TO BE APPOINTED BY THE GOVERNOR, SUBJECT TO CONFIRMATION BY A MAJORITY OF THE SENATE OF THE GENERAL ASSEMBLY OF THE STATE OF COLORADO. MEMBERS OF THE BOARD OF ADVISORS SHALL BE NOMINATED BY VARIOUS GROUPS WITHIN EACH AREA OF INTEREST IN A MANNER TO BE DETERMINED BY THE GENERAL ASSEMBLY. THE TERMS OF THE ADDITIONAL FOUR MEMBERS OF THE BOARD OF ADVISORS SHALL BE SET BY THE GENERAL ASSEMBLY. THE BOARD OF DIRECTORS SHALL ALSO RECEIVE REGULAR FINANCIAL REPORTS, NO LESS THAN ONCE A MONTH, FROM THE MANAGEMENT OF THE BANK. THE FINANCES OF THE BANK SHALL BE AUDITED ANNUALLY BY AN INDEPENDENT ACCOUNTING FIRM FREE FROM ANY CONFLICTS OF INTEREST WITH THE BANK OR STATE. EXCEPT FOR THE PRESIDENT OF THE BANK, WHO SHALL BE APPOINTED BY THE BOARD OF DIRECTORS, THE MANAGEMENT AND EMPLOYEES OF THE BANK SHALL BE HIRED ACCORDING TO THE STANDARDS OF THE STATE PERSONNEL SYSTEM, WHICH SHALL ENDEAVOR TO HIRE THE BEST QUALIFIED PERSONS AND COMPENSATE THEM ACCORDINGLY. THE PERSON APPOINTED AS PRESIDENT MUST HAVE SUBSTANTIAL EXPERIENCE IN BANKING. THE MANAGEMENT OF THE BANK SHALL BE RESPONSIBLE FOR THE DAY-TO-DAY OPERATIONS OF THE BANK, WHICH SHALL FOLLOW THE GENERAL OBJECTIVES SET BY THE BOARD OF DIRECTORS.

*(3) RULES AND REGULATIONS OF STATE BANK.* AFTER PASSAGE OF THIS AMENDMENT, THE INITIAL MANAGEMENT OF THE BANK, CONSISTING OF THE TOP FIVE OFFICIALS OF THE BANK, SHALL BE CHARGED WITH DRAFTING THE RULES AND REGULATIONS OF THE BANK, SUBJECT TO APPROVAL BY ADVISORY BOARD, THE BOARD OF DIRECTORS OF THE BANK, AND THE COLORADO GENERAL ASSEMBLY AND SIGNED BY THE GOVERNOR, IN ACCORDANCE WITH THE RULES OF THE LEGISLA-

TURE. PRIOR TO SUCH APPROVAL THE RULES AND REGULATIONS PROMULGATED BY THE SAID OFFICIALS SHALL BE EFFECTIVE.

*(4) CAPITALIZATION OF STATE BANK:* THE CAPITALIZATION OF THE BANK MAY INCLUDE ALL TAX AND OTHER REVENUES AND FUNDS OF THE STATE, SUBJECT TO SOUND BANKING PRACTICES. SPECIFICALLY ALLOCATED FUNDS AND OTHER ASSETS OF THE STATE NORMALLY HELD BY FINANCIAL INSTITUTIONS SHALL BE DEPOSITED AND HELD BY THE BANK.